STATE OF NEBRASKA, APPELLEE, V. SANFORD W. McCONNELL, APPELLANT.

266 N. W. 2d 219

Filed May 31, 1978. No. 41535.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and Paul W. Snyder, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

SPENCER, J.

Defendant, Sanford W. McConnell, who is a building contractor, appeals his conviction under section 52-123, R. R. S. 1943, for failure to apply money re-

ceived in payment of lawful claims of laborers or materialmen. Defendant assigns as error the unconstitutionality of the statute, and that he was found guilty without proof of fraud. We reverse.

In a proposal dated May 29, 1974, Urban Builders, Inc., agreed to furnish labor and materials to construct a kitchen addition to a house owned by Dominic Romeo for a total price of $9,150. Payment terms were "10% upon acceptance of proposal, 40% upon start, balance due at completion." The proposal was signed by Sanford W. McConnell, who was the president of Urban Builders, Inc.

The proposal was delivered to the home of Romeo by John Boles, an employee of Urban Builders, Inc. He had estimated the job and was the supervisor of the project. The document does not bear the signature of Mr. Romeo for acceptance of the proposal. It does, however, contain a notation made by Boles, as follows: "$915.00 paid in cash as down payment." This notation is signed by J. Boles, as an acknowledgment that he received it.

The cash was delivered to Richard Slezak, who was the treasurer and accountant for Urban Builders, Inc. It was deposited in the corporation's operating fund. He drew the checks on the operating fund. These checks had another signature as well as his own. The money was used to pay a telephone bill, Boles' wages, and 1 week's salary for Slezak. The money was disbursed within 7 days after receipt. To his knowledge, no invoice or statement of work was ever presented by the subcontractor for the Romeo job.

Work was begun June 21, 1974, when Stier & Sons Construction, Inc., performed excavation work and laid the foundation. It ended June 28, 1974. Romeo's architect testified this work was satisfactory and complete except for a few things which had to wait until the carpenters began work. A mechan-

ic's lien in the amount of $1,953 for this work was filed September 19, 1974.

When no further work was forthcoming, Romeo and his architect went to defendant's office for a meeting. Romeo testified defendant told him the company was having financial problems and the job had been underbid. After consulting with the architect, Romeo agreed to an increase in the contract price to get the job done. An agreement to this effect was executed July 8, 1974. This agreement, so far as material herein, reads as follows: "Mr. Romeo has agreed to raise the contract price from $8,650.00 to $10,050 plus $500.00 contingency providing that Jim Windorski is the carpenter on the project to include rough and finish and to commence work on Friday, July 12 but not later than Monday, July 15th. A written schedule is to be delivered by July 18th 1974. Work is to be completed within 45 days. Payment is to be made directly to the carpenters and Urban Builders Inc. is to pay masonry contractor.

"All other work as per contract." This proposal is signed by Sanford W. McConnell, and like the other one bears no signature or acceptance by Romeo.

Work did not resume after the execution of this agreement. Romeo did not make any further payments. He testified his reason for not paying the 40 percent of the contract price called for in the original agreement was that defendant refused to provide a performance bond which Mr. Boles had promised at the time of contracting.

The architect, Norman Reece, was present when both of the agreements were executed. He believed that on each occasion there had been two documents and Romeo had signed the one retained by defendant. He testified Boles had stated at the time of contracting that there would be no problem in obtaining a performance bond and it "would be returned within several days, as soon as they had time to get

it." Reece further testified when the contract was modified, they were promised that a performance bond would be provided the following day. After the second agreement was signed, he was unable to contact defendant because the telephone had been disconnected. He called Boles at home several times and was repeatedly assured that a performance bond would be issued. He could not recall why work did not resume by July 15, 1974. He felt the carpenter he had recommended was working on another job at that time.

Defendant testified he was informed by Boles that a performance bond had been requested. He told Romeo at the meeting in his office that he had been negotiating with the bonding company but that no performance bond could be provided. Romeo agreed to waive any performance bond requirement. Defendant testified he also informed Romeo at this meeting that the carpenter selected for the job had raised his price but that another carpenter could be used. Romeo stated he wanted the carpenter, a Mr. Windorski, to perform the carpentry work and was willing to pay more money.

As to the reason work was not resumed after June 28, 1974, defendant testified: "At the time we met in the office, I told them that the carpenter was involved with another job and I told them I thought at the time that he would be out there within a week. Evidently it took him longer to get out on the job but I have no control to go out there and physically to force him to leave the one job to start the other. In the mean time, our phone was shut off. Mr. Reece talked to John Boles and he said because of the fact that our phone was shut off that we were terminated on the job. This was related to me by Mr. Boles."

Defendant also testified it is a common practice in the construction industry to "front load" a job by paying overhead expenses from the downpayment. He intended to pay Stier & Sons Construction, Inc.,

when he received the payment of 40 percent of the contract price from Romeo. Defendant requested payment of this amount at the meeting in his office. He testified: "I asked him (Mr. Romeo) the day he came into the office and I told him that we could not provide the performance bond. He said at that time he was keeping all copies of the contract. I had not had a copy of the contract myself. And he said that when Windorski got on the job that he would fund additional money."

Section 52-123, R. R. S. 1943, provides: "It shall be unlawful for any person, firm, or corporation who has taken a contract for the erection, improvement, repair, or removal of any house, mill, manufactory, or building of any kind for another, and has received payment in whole or in part upon such contract, to fail to apply the money so received, or so much thereof as may be necessary for that purpose, in payment of the lawful claims of such laborers or materialmen as could otherwise have a right to file a laborers' or materialmen's lien against such house or other structure, *with the intent thereby to deprive or defraud the owner or person so paying the person, firm or corporation receiving payment, of his funds without discharging the liens,* unless such person, firm, or corporation, taking such contract, shall have received and delivered to the owner of the property the written waiver of lien from all persons who otherwise would have a right to file a lien thereon. In any prosecution under sections 52-123 and 52-124 of the person, firm, or corporation so receiving payment, when it shall be shown in evidence that any lien for labor or materials existed in favor of any laborer or materialman and that such lien has been filed within the time and at the place as provided by law for the filing of such liens and that such person, firm, or corporation charged has received payment without discharging the lien to the extent of the funds received by him, the fact of acceptance of

such payment without having discharged the lien within ten days after receipt of such payment shall be prima facie evidence of intent to deprive or defraud on the part of the person, firm, or corporation so receiving payment." (Italics supplied.)

Defendant did not raise the constitutional issue in the trial court. It is raised for the first time on appeal. For a question of constitutionality of a statute to be considered in this court it must be properly raised in the trial court. If it is not raised in the trial court, it will be considered as waived in this court. State v. Jacobsen, 194 Neb. 105, 230 N. W. 2d 219 (1975).

We agree with the defendant. The evidence presented would indicate the trial court found the defendant guilty without proof of fraud. The following extracts from the comments of the court point up the basis for his decision: "I am not at all persuaded that the failure to pay the 40 percent is the reason it didn't start. On the $915.00, I am going to tell you that I think that under the statute and the law this was really trust funds. Those monies are to be devoted exclusively to this job. If there is overhead that you paid and telephone bills and everything that comes out of his profit if he has it, * * *. The only other thing that really bothers me is the question of intent to defraud. Now it is in the alternative with the intent to deprive or defraud the owner —. Now, that is the only thing that bothers me. I really feel that within the statute and within the evidence here and everything, the $915.00 is earmarked for this job. If he diverted it to some other use, he did it at his own risk * * * I am inclining (sic) to believe that an intent to deprive exists regardless of how well motivated he is when he diverts one person's money for another person — for another purpose."

In State ex rel. Norton v. Janing, 182 Neb. 539, 156 N. W. 2d 9 (1968), this court found the previous statute on this subject to be unconstitutional in that it

failed to require a finding of fraud and permitted a prosecution for a criminal offense for the failure to pay a contractual obligation without proof of fraud. We there stated: "It is impossible to frame a valid statute punishing by imprisonment the exercise of the right to religious liberty, or the right to petition for the redress of grievances, or the right to be exempt from imprisonment for debt except in cases of fraud. These are all constitutional rights, which cannot be abridged under the guise of legislation against crime. The exercise of them cannot be crime."

The statute involved in State ex rel. Norton v. Janing, *supra*, was repealed as unconstitutional and replaced by section 52-123, R. R. S. 1943, in 1969. The pertinent portion added is the following: "with the intent thereby to deprive or defraud the owner or person so paying the person, firm or corporation receiving payment, of his funds without discharging the liens." It is evident that this language was added to comply with our holding that it was only in cases of fraud where the statute could be upheld.

While, as the trial court noted, the language in section 52-123, R. R. S. 1943, is "with the intent thereby to deprive or defraud," it cannot be construed in the alternative as was done by the trial court.

As stated in State v. Holtan, 197 Neb. 544, 250 N. W. 2d 876 (1977): " 'Penal statutes should be construed so as to give effect to the plain meaning of the words employed, and where of doubtful meaning, or application, the court should adopt the sense that best harmonizes with the context and the apparent policy and objects of the Legislature.' State v. Reich, 186 Neb. 289, 183 N. W. 2d 223."

Properly construed, "with the intent thereby to deprive or defraud" should read as though it read "with the fraudulent intent thereby to deprive * * *." Unless so construed, it is still subject to the vice pointed out in State ex rel. Norton v. Janing, *supra*.

The test is one of bad faith. Unless it is so construed, the enactment of the new statute did not accomplish its purpose.

On the trial court's reference to trust funds, State ex rel. Norton v. Janing, *supra*, held: "We point out that section 52-119, R. R. S. 1943 (now section 52-123, R. R. S. 1943), does not make the general contractor an agent or trustee for laborers or materialmen in receiving payments from the property owner, nor does it make the amounts so received a trust fund * * *."

Without attempting to analyze the pros and cons of the fact that the owner himself did not live up to the contract, or discussing other issues involved, it is sufficient to say that the prosecution failed to sustain its burden of proving a crime. It failed to introduce evidence in regard to an essential element of the crime, the intent of the defendant to defraud. The judgment herein is reversed and the cause is remanded with directions for its dismissal.

REVERSED AND REMANDED.