**In the Matter of Christopher Wallace BOYLE, Debtor.**

**Christopher Wallace BOYLE, Plaintiff-Appellant,**

**v.**

**ABILENE LUMBER, INC., Defendant-Appellee.**

**No. 86–1802**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

June 19, 1987.

Charles Dick Harris, Abilene, Tex., for plaintiff-appellant.

Brian Cutbirth, Gary M. Brown, Abilene, Tex., for defendant-appellee.

Before CLARK, Chief Judge, GARWOOD and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Christopher Boyle ("Boyle") appeals a bankruptcy court decision, affirmed by the district court, holding that Boyle was personally liable on debts for supplies incurred by two Texas corporations Boyle controlled and that these debts were not dischargeable in bankruptcy. The courts below ruled that a Texas statute addressing the use by contractors of construction funds created a trust for bankruptcy purposes and that Boyle, who had used funds advanced for specific projects on other projects, but was not found to have done so fraudulently, could not discharge debts owed to unpaid creditors. Because we conclude that the Texas statute does not suffice to constitute Boyle's conduct a fiduciary defalcation for purposes of the nondischargeable debt exception of the Bankruptcy Code, we reverse.

## I.

Appellant owned and operated two corporations in the Abilene, Texas area. Christopher Boyle Builder, Inc. ("Boyle Builder"), was engaged in the residential construction business and at times had several construction jobs underway simultaneously. Boyle's other corporation, Abilene Home Energy, Inc. ("Home Energy"), evaluated the insulation and other weatherproofing in existing homes and installed insulating materials to make homes more energy efficient. Both corporations purchased materials on credit from, *inter alia,* Abilene Lumber, Inc. ("Abilene Lumber"). The courts below found that Boyle executed a personal "guaranty agreement" in favor of Abilene Lumber for purchases made by each corporation.

Beginning in late 1981, Boyle Builder began to encounter financial problems. In September 1982, Abilene Lumber filed mechanic's and materialman's liens on four houses built by Boyle Builder, but later released two of these liens. In 1983, Boyle's primary lender, Abilene National Bank ("the Bank") instituted foreclosure proceedings and attempted to collect a deficiency. Boyle and his businesses filed this bankruptcy proceeding on June 7, 1984.

Abilene Lumber had supplied but not been paid for materials it identified through invoice job descriptions as having been purchased (1) by Home Energy, without describing any specific projects for which the supplies were acquired, and (2) by Boyle Builder for four houses it had constructed, with specific invoices traceable to each building project. Abilene Lumber filed a complaint requesting the bankruptcy court to determine the dischargeability of these five debts, and the issue came to trial on March 14, 1985.

The court held that none of the debts were dischargeable. In evaluating the Boyle Builder purchases, the court focused on four houses constructed by that firm and concluded that Boyle Builder had financed building three with loans from the Bank and the fourth with construction payments from the individual for whom the house was being built.[1] The court conclud-

1. The four houses are identified here by the addition to the City of Abilene in which each was located. The totals of the funds provided for construction and owed to Abilene Lumber established by the court below were as follows:

| Property | Source of funds | Amount provided | Amount owed Abilene Lumber |
|---|---|---|---|
| Coronado Estates | Owner | $ 69,791 | $ 8,574.20 |
| Mesquite Forest | Bank | $ 67,920 | $ 3,473.75 |
| Hunters Creek | Bank | $ 58,400 | $ 1,274.92 |
| Lytle Shores | Bank | $150,000* | $ 2,205.46 |
| TOTAL | | $346,111 | $15,528.33 |

* The bankruptcy court described this as an approximate amount.

ed Boyle was personally liable for $15,-528.33 in credit purchases from Abilene Lumber made by Boyle Builder and for $1,851.31 in credit purchases by Home Energy.

The bankruptcy court found, and the district court agreed, that Boyle Builder had deposited all loan proceeds and construction contract payments into a single business checking account, into which it also deposited the proceeds of other work, and that Boyle Builder had not used any system to segregate loan or construction contract payment funds in order to ensure that they were used only on the construction project for which the corporation received them but, instead, had merely drawn checks on its account as bills fell due without regard to the source of the funds.

The courts below held that all five debts were nondischargeable because, first, a Texas statute [2] treats funds loaned or paid under a construction contract to finance an improvement on specific real property as funds the builder holds in trust for the benefit of those unpaid creditors who contributed labor or material to the project, and, second, because provisions of the Bankruptcy Code state that an individual's debts "for fraud or defalcation while acting in a fiduciary capacity" cannot be discharged.[3] There was no finding, and indeed no evidence, that Boyle or either of his corporations acted fraudulently, or that there were any agreements with Abilene Lumber, the Bank, or the homeowner which either required segregation of the funds, or otherwise by force of their own terms, and apart from the Texas statute, made Boyle or his companies fiduciaries of the funds. Indeed, there is no finding or evidence that Boyle or his corporations breached any of their agreements in any way other than by failing to pay the amounts claimed.

Appellant challenges the conclusions of the district court on three grounds, substantially as follows: (1) that the Texas statute does not suffice to constitute Boyle's conduct a fiduciary defalcation for purposes of the Bankruptcy Code debt discharge exception; (2) that the courts below erred in finding the entire claim of Abilene Lumber was nondischargeable rather than only an amount equal to appellant's actual "misapplication" on each particular project; and (3) that the claim against Home Energy did not in any event fall within the scope of the Texas statute.

We agree with appellant's first contention. Because it is dispositive of this dispute, we need not decide and do not reach his remaining claims.

## II.

### A. The Texas construction funds statute

We examine first the Texas construction funds statute, 3 Tex.Prop.Code Ann. §§ 162.001 to .033 (Vernon 1984), which provides in pertinent part as follows:

"**Section 162.001**

"(a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

"(b) Loan receipts are trust funds under this chapter if the funds are borrowed by a contractor, subcontractor, or owner or by an officer, director, or agent of a contractor, subcontractor, or owner for the purpose of improving specific real property in this state, and the loan is secured in whole or in part by a lien on the property.

"**Section 162.002**

"A contractor, subcontractor, or owner, or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

---

**2.** 3 Tex.Prop.Code Ann. ch. 162 (§§ 162.001 to .033) (Vernon 1984) (discussed and quoted below).

**3.** 11 U.S.C. § 523(a)(4) (discussed and quoted below).

**586**

"Section 162.003

"An artist, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

"Section 162.004

" . . . .

"(b) The Texas Trust Act ... does not apply to any trust created under this chapter. . . .

"Section 162.031

"(a) Except as provided by Subsection (b), a trustee who, with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all obligations incurred by the trustee to the beneficiaries of the trust funds has misapplied the trust funds.

"(b) A trustee may use trust funds to pay the trustee's reasonable overhead expenses that are directly related to the construction or repair of the improvement.

"Section 162.032

"(a) A trustee who misapplies trust funds amounting to less than $250 commits an offense punishable by confinement in jail for not more than two years and by a fine of not more than $500 or by the confinement without the fine.

"(b) A trustee who misapplies trust funds amounting to $250 or more commits an offense punishable by imprisonment in the Texas Department of Corrections for not more than 10 years."

█ Applying the statute to the facts of this case, the courts below correctly concluded that section 162.001 reached the funds loaned by the Bank for three projects and paid by the owner under a construction contract on the fourth project and that Abilene Lumber's credit sales to Boyle Builder for these four homes, by which Abilene Lumber furnished building materials for "an improvement on specific real property," placed the creditor within the class of beneficiaries described by section 162.003. While we are inclined to view the sales to Home Energy as not addressed by the Texas statute, we treat this fifth claim *arguendo* as though it also were within its coverage, although our discussion will be only in terms of the Boyle Builder claims.[4]

The actual language of the Texas statute, we emphasize, provides only for a criminal penalty and then only if the holder of construction funds "retains, uses, disburses, or otherwise diverts trust funds without first fully paying all obligations" to the named classes of creditors *"with intent to defraud."* The statute contains no provision requiring the fund holder to segregate funds by source and project; it does not prohibit the commingling of funds; it does not bar use of funds provided for one project to pay bills incurred on another project if this is done without an "intent to defraud"; and it does not prohibit a fund holder from paying, without any fraudulent intent, creditors on one project with surplus funds left over from earlier work and then using the funds provided for that later project on still other work. In short, the statute does not create "red," "blue," and

---

**4.** Neither the findings of the bankruptcy court and district court nor the record below make reference to any identifiable pool of funds provided under a construction contract or loaned to Home Energy for improvements on *"specific real property,"* a fundamental prerequisite for the application of sections 162.001 and 162.003. Indeed, the only testimony about the Home Energy purchases indicated they were not traceable to a specific property but, instead, included equipment used on more than one project and purchases for projects other than the four homes involved in this case. Consequently, we find no support for the conclusion of the courts below that Abilene Lumber's claim against Home Energy was analogous to its claims against Boyle Builder, which were based on materials supplied for construction or improvements on specific, identified real property as to which Boyle Builder had received construction loan proceeds secured by the respective properties or construction contract advances. Our decision that the debt discharge exception of section 523(a)(4) is inapplicable on other grounds, however, makes it unnecessary to remand for further findings on this issue respecting Home Energy.

"yellow" dollars each of which can only be used for the "red," "blue," or "yellow" construction project. Although cases construing the statute have expanded its reach beyond its express language, the above-referenced limitations in the statute's actual terms are relevant in determining what *fiduciary* duties are imposed on the fund holder and the manner in which the state's statutory construction funds "trust" interacts with the Bankruptcy Code debt discharge exception for those debts arising from fiduciary activities.

## B. The Bankruptcy Code's nondischargeable debt provision

The general policy of bankruptcy law favors allowing the debtor to discharge debts and to make a fresh start.[5] This policy, however, is subject to exceptions for certain types of debts, including those arising from a debtor's malfeasance.[6] The specific exception relied upon by both courts below is provided in 11 U.S.C. § 523(a)(4), which, like its predecessor statute,[7] bars discharge of those debts a debtor incurs through "defalcation while acting in a fiduciary capacity." Although the language of section 523(a)(4) does not precisely parallel that of its predecessor statute,[8] for purposes of this appeal we assume that Congress did not intend to narrow the substantive content of this particular debt discharge exception by enacting section 523(a)(4), and we apply decisions construing the predecessor section as though they were equally applicable to section 523(a)(4).[9]

■ The plain language of the statute and limited evidence of congressional in-

---

**5.** *E.g., Lines v. Frederick,* 400 U.S. 18, 91 S.Ct. 113, 114, 27 L.Ed.2d 124 (1970) (describing the overriding purpose of bankruptcy law as giving the debtor a " 'new opportunity in life and [a] clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt' ") (citation omitted); *Murphy & Robinson Investment Co. v. Cross (In re Cross),* 666 F.2d 873, 879 (5th Cir.1982) ("The overriding purpose of the bankruptcy laws is to provide the bankrupt with comprehensive, much needed relief from the burden of his indebtedness by releasing him from virtually all his debts."); *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1339 (5th Cir.1980) (quoting the passage from *Lines* ).

**6.** 11 U.S.C. § 523 limits discharge for nine categories of debts. These include obligations to pay taxes, fines, customs duties, alimony, and child support, and debts incurred through larceny or embezzlement, or by obtaining money, property, services, or credit by false pretenses.

**7.** 11 U.S.C. § 35(a)(4) (§ 17(a)(4) of the Bankruptcy Act of 1898), repealed and reenacted as amended (by Pub.L. No. 95–598, 92 Stat. 2590 (1978)) at 11 U.S.C.A. § 523(a)(4).

**8.** Former section 35(a)(4) and current section 523(a)(4) vary somewhat in their language:
"A discharge in bankruptcy shall release a bankrupt from all of his provable debts ... except such as ... were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity." § 35(a)(4).
"A discharge under [various sections] of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny...." § 523(a)(4).

**9.** An earlier decision of this Court interpreting section 35(a)(4) and addressing a contractor's use of construction funds for projects other than the project for which the funds were advanced used the term "misappropriation" to describe the contractor's conduct. *Angelle, supra,* at 1337, 1341.
Section 523(a)(4), however, omits "misappropriation." It also makes it clear that the "while acting in a fiduciary capacity" phrase no longer modifies "embezzlement." *Compare Crawford v. Burke,* 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147 (1904) (construing the "while acting in" phrase of section 35(a)(4) as modifying "defalcation," "misappropriation," "fraud," and "embezzlement"). Although "misappropriation" has been deleted from the statute, our review of the legislative history of section 523(a)(4) discloses no clear signals from Congress about the significance, if any, of this omission.
We note that "defalcation" is normally defined as specifically applicable to trust funds and that "misappropriation" typically reaches a wider range of conduct, *see, e.g., Black's Law Dictionary* (5th ed. 1979). The Supreme Court's 1904 *Crawford* decision, however, restricted the meaning of "misappropriation" for purposes of section 35(a)(4) by holding that it was modified by the fiduciary capacity phrase. This had the effect of narrowly limiting the meaning of "misappropriation" in the statute, rendering it largely synonmous with "defalcation." Consequently, we cannot view the omission of "misappropriation" from section 523(a)(4) as evidence of congressional intent to further restrict this exception.

tent[10] indicate that the pertinent debt discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's.[11]

Cases construing the Bankruptcy Act's exceptions to debt dischargeability are "consistent with the well-established principle that exceptions to discharge should be limited to those clearly expressed in the statute." *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1339 (5th Cir.1980). Those exceptions expressed in the Act are generally to be "narrowly construed ... against the creditor and in favor of the bankrupt." *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 879–80 (5th Cir.1982). These same principles should apply to the Bankruptcy Code.

This Court has on three occasions examined the relationship between the predecessor statute to section 523(a)(4) and state construction fund "trust" statutes other than the Texas act. We held on two occasions that the state statutes did not create a trust for purposes of the Bankruptcy Code. *Cross, supra* (holding Georgia statute did not create a trust cognizable for purposes of section 35(a)(4)); *Angelle, supra* (reaching this result construing a similar Louisiana statute). In one opinion, we determined that the state statute did operate to create a trust that could be recognized under the standards of the debt discharge exception. *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir.1980) (finding that Oklahoma statute did create a trust for purposes of section 35(a)(4)).

In each decision, we were guided by the Supreme Court's holdings that the exception applies only to a "technical trust ... [which] must exist prior to the act creating the debt and without reference to that act." *Angelle, supra*, at 1338.[12] Like the Texas statute, the Georgia and Louisiana laws involved in *Cross* and *Angelle* provided only for criminal penalties and did not bar a contractor's use of funds for other pur-

---

**10.** The most significant passage in the legislative history addressing subsection 523(a)(4) is the following:

"Paragraph (4) excepts debts for embezzlement or larceny. The deletion of willful and malicious conversion from § 17a(2) of the Bankruptcy Act is not intended to effect a substantive change. The intent is to include in the category of non-dischargeable debts *a conversion under which the debtor willfully and maliciously intends to borrow property* for a short period of time with no intent to inflict injury but on which injury is in fact inflicted." 1978 U.S. Code Cong. & Ad. News 6320 (reprinting H. Rep. No: 595, 95th Cong., 2d Sess. 364; emphasis added).

**11.** *Cross, supra*, at 880 ("The exceptions to discharge found in § 17(a)(4) [now 523(a)(4) ] were designed to prevent the bankrupt from avoiding through bankruptcy the consequences of certain *wrongful acts* by providing protection to a certain preferred class of creditors.") (emphasis added). *See generally* 3 *Collier on Bankruptcy* ¶ 523.14, at 523–88 to –99 (1987) (analyzing section 523(a)(4)). This emphasis given to wrongful acts involving the property of people other than the debtor raises the question whether a state statute that, like the Texas law, does not in terms prohibit uses of construction funds loaned the builder absent fraudulent intent can create a class of "property" for Bankruptcy Code purposes that a builder can convert merely by using the funds in a way not forbidden by the state statute. In a traditional express trust, a trustee "borrows" trust funds whenever he applies them to nontrust purposes because a trustee lacks equitable title to those funds and holds only a bare legal title; in contrast, funds loaned to a builder who has free use of the funds so long as he does not act with fraudulent intent are not even equitably owned by *someone other* than the builder and therefore are not "borrowed" when the builder uses them.

**12.** *Angelle* cites and discusses *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1890), and *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844). *See also Cross, supra*, at 881 (quoting *Angelle*); *Carey, supra*, at 374 (adopting the opinion of then District Judge Patrick Higginbotham; noting the debt discharge exception applies "only to true trusts" and holding the Oklahoma statute "created ... an express trust" by "clearly defin[ing] the trust res and charg[ing] the trustee with affirmative duties in applying the trust funds").

poses.[13] Unlike the Texas statute, the Oklahoma lien law found to create a trust for purposes of the debt discharge exception strictly limited the use of construction funds to the project for which the funds were loaned or advanced, *expressly prohibiting* any other use.[14] There is no comparable provision in the Texas statute.

We found that the state statutes in *Cross* and *Angelle* imposed no obligations on the holder of construction funds unless and until creditors were unpaid after fund diversion had occurred. In that event, the statutes only provided for criminal sanctions. Therefore, we held that these statutes did not create trusts fulfilling the debt discharge requirement "that the trust arise prior to the act creating the debt." *Angelle, supra,* at 1340; *see also Cross, supra,* at 881. Unlike those two statutes, however, section 162.001 of the Texas statute does flatly state that construction funds are "trust funds." Consequently, our analysis of the Texas statute for debt discharge purposes is not directly controlled by these three earlier decisions.

We now turn to consider some of the decisions dealing with state law effects of the Texas statute, and then decisions concerning the debt discharge exception as applied to construction fund statutes in other states.

## C. Other decisions

Our analysis of decisions construing the Texas statute indicates that it has been read as creating several rights for purposes of state law. Principal among these is allowing materialmen or similar project creditors to impose *personal* liability on individuals whose corporations held and diverted construction funds even in the absence of a personal guaranty agreement from those individuals. Although state court decisions have also applied the Texas statute in other contexts,[15] we find no decision of this Court or any Texas court holding that the Texas statute creates the sort of true trust required for application of the debt discharge exception of section 523(a)(4).[16]

In *Owens v. Drywall and Acoustical Supply Corp.,* 325 F.Supp. 397 (S.D.Tex. 1971), the district court addressed the question of whether a tax lien against construction funds would preempt the claims of laborers who remained unpaid. The court emphasized that wages were accorded special treatment in, *inter alia,* the Bankruptcy Act, 325 F.Supp. at 401, and concluded that the unpaid laborers had a protected interest in the fund—and the employer did not—and that the workers' special status precluded the tax lien from having priority over their claims. Although there was no bankruptcy involved in *Owens,* the district court looked to a bankruptcy policy which " 'provide[s] the workman a "protective cushion" against the economic displacement caused by his employer's bankruptcy.' " *Id.* In this case, in contrast, no

---

13. *Cross, supra,* at 881–82 n. 13 (discussing the Georgia statute and comparing it to the statutes involved in *Angelle* and *Carey* ); *Angelle, supra,* at 1337 n. 4 (quoting the Louisiana statute); *id.* at 1339–41 (discussing Louisiana statute and decisions construing other lien laws in relationship to the debt discharge exception).

14. " 'Such trust funds shall be applied to the payment of said valid lienable claims and *no portion thereof shall be used for any other purpose* until all lienable claims due and owing shall have been paid.' " *Carey, supra,* at 373 n. 2 (quoting the Oklahoma statute; emphasis added).

15. Texas courts have held, *inter alia,* that the statute gives its beneficiaries state-law priority as creditors, *see Panhandle Bank & Trust Co. v. Graybar Electric Co., Inc.,* 492 S.W.2d 76 (Tex. Civ.App.—Amarillo 1973, writ ref'd n.r.e.), and

overcomes at least some procedural deficiencies that can arise in an attempt to enforce a contract between the creditor and contractor, *see Stone Fort National Bank v. Elliott Electric Supply Co.,* 548 S.W.2d 441 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.) (on a notice issue).

16. As discussed below, however, *Capital Aggregates, Inc. v. Waters (In re Waters),* 20 B.R. 277 (Bankr.W.D.Tex.1982), which we decline to follow, held the Texas statute created a trust for purposes of the debt discharge exception.

17. Tex.Civ.Stat.Ann. art. 5472e (repealed and replaced by Tex.Prop.Code Ann. ch. 162). The predecessor statute contained language to the same effect as that now found in the property code. *See, e.g., Gonzales v. State,* 670 S.W.2d 413, 414 (Tex.App.—Corpus Christi [13th Dist.] 1984) (quoting article 5472e).

unpaid wages are in issue and the pertinent policy of bankruptcy law is the preference for allowing the debtor a fresh start free of debt.

*Nuclear Corp. of America v. Hale,* 355 F.Supp. 193 (N.D.Tex.1973), *aff'd,* 479 F.2d 1045 (5th Cir.1973), read the predecessor version of the Texas statute [17] as facially penal but also as creating by implication a civil remedy because of the statute's remedial nature. 355 F.Supp. at 197. The effect of *Hale*'s interpretation of the statute was to allow subcontractors, laborers, or materialmen to impose *personal liability* on officers of a corporation which used funds advanced for specific construction work for purposes other than that project. *Hale*'s holding is that officers of a corporation which "diverts" such "trust" funds— even without any intent to defraud—may be held personally liable (two officers were found liable in *Hale,* but one was not) in the event the corporation's project debts are not paid.

The practical effect of *Hale* is to allow personal liability to be imposed on corporate officers or others similarly situated who control and "divert" funds. Such individuals become, to the extent of the "diversion," personal guarantors of the builder's project-related debts to laborers, materialmen, subcontractors, and the like. The message of the statute, as thus construed, is *not necessarily* that the individuals do anything *wrong* in "diverting" the funds, but is rather that if they do so "divert" they had better be sure that the project debts to such creditors will be paid, as the

*risk* of nonpayment then falls on them *personally.* In the instant case, however, Boyle had signed personal guarantees in favor of Abilene Lumber. Thus, Abilene Lumber's recourse to the Texas statute was not for the purpose of penetrating Boyle's corporate shield against personal liability (all that was at issue in *Hale*), but to extend Boyle's existing personal liability past bankruptcy. *Hale* did not involve the debt discharge exception.

In *North Texas Operating Engineers Health Benefit Fund v. Dixie Masonry, Inc.,* 544 F.Supp. 516 (N.D.Tex.1982), the court held that a creditor's claim is actionable under the Texas statute only if the fund holder had expended less on the project than the amount of funds provided or loaned,[18] but, again, the decision involved only state law and did not address issues directly pertinent to this case. However, the opinion implicitly recognized that the Texas statute does not absolutely bar the use of construction funds for other purposes.[19]

Our review of these decisions indicates that this Court has not previously resolved whether the Texas statute creates a trust for purposes of the debt discharge exception. Our decisions involving the statutes of other states, however, like those of other courts confronting similar state statues, have applied strict standards in deciding whether such statutory trusts meet the fiduciary debt discharge exception.

The Ninth Circuit held that California's construction funds statute (resembling the Louisiana statute in *Angelle*) did not estab-

---

**18.** In *Dixie Masonry,* the court concluded that the funds provided for two construction projects had been exhausted on the projects and that the plaintiff consequently could not avail itself of the Texas statute to enforce payment of its claims. We note that appellant's second contention in this appeal addresses this point and asserts that the courts below did not apply the methodology of *Dixie Masonry,* which calculated the total of funds provided for and expended on each project. *Dixie Masonry* indicates that creditors' claims must be limited to the amount of funds actually diverted.

**19.** The opinion suggests that the statute does not absolutely prohibit a nonfraudulent commming-

ling of funds, even though the statute by its penal provisions (and, implicitly, as construed to make "diverters" personal guarantors to the extent of the "diversion") would have the effect of "discouraging" the diversion of funds:

"[The statute] can be interpreted to impose personal liability on those designated as trustees under the statute for the misapplication of funds under their control.... Also, this provision probably was enacted for the purpose of *discouraging* contractors from engaging in the customary practice of paying the last job's expenses with the next job's financing." 544 F.Supp. at 520 (emphasis added; citing *Hale* and a law review article).

lish a trust for bankruptcy purposes. *Runnion v. Pedrazzini (In re Pedrazzini),* 644 F.2d 756 (9th Cir.1981). The *Pedrazzini* opinion recognizes that a trust imposed by a statute may be effective to make a debt nondischargeable, concluding that the manner of creation of the trust is not controlling but emphasizing that, "[r]ather, the focus should be on whether true fiduciary responsibilities have been imposed." 644 F.2d at 758 n. 2. *See also Schlecht v. Thornton (In re Thornton),* 544 F.2d 1005 (9th Cir.1976) (holding Oregon statute did not create a fiduciary relationship).

The Eighth Circuit, citing two Nebraska Supreme Court decisions construing a state statute closely analogous to the Texas law, concluded that because the state's courts had held the statute did not establish a trust even under state law, the statute therefore could not meet the debt discharge standards. *Delaney v. Dloogoff (In re Dloogoff),* 600 F.2d 166 (8th Cir.1979) (citing *Norton v. Janing,* 182 Neb. 539, 156 N.W.2d 9 (1968) (construing the original version of the state statute), and *State v. McConnell,* 201 Neb. 84, 266 N.W.2d 219 (1978) (construing the statute as amended in 1974)).

Several bankruptcy court decisions on state lien statutes have rejected the nondischargeability of debts arising from such statutory "trusts." *Parrotta v. Rausch (In re Rausch),* 49 B.R. 562 (Bankr.D.N.J. 1985), refused to find that a trust was created for bankruptcy purposes even though New Jersey's statute—closely parallel to the Texas act—purported to create statutory construction fund trusts that were intended to function in spite of bankruptcy. *Id.* at 563.

*Teamsters Local 533 v. Schultz (In re Schultz),* 46 B.R. 880 (Bankr.D.Nev.1985), addressed the same issue as the *Dixie Masonry* decision (payments due to fringe benefit fund for employees), but unlike *Dixie Masonry,* did so in the context of bankruptcy. The *Schultz* court held that the Nevada statute did not create a fiduciary relationship and that the employer— not the fringe benefit fund—was the sole *owner* of the construction sums provided it. Thus, the debt was dischargeable because (1) the fiduciary debt discharge exception did not apply and (2) the embezzlement exception was inapplicable because a property owner cannot embezzle his own property. The Nevada statute at issue, like the Texas law, imposed only criminal penalties, but, unlike the Texas statute, did not specifically use the term "trust." *Id.* at 885.

State lien laws have been held to create trusts for purposes of section 523(a)(4) or its predecessor in a limited number of cases. We so held respecting the Oklahoma statute in *Carey,* but as previously noted that statute, *unlike* the Texas statute, expressly prohibits any nonproject use of the funds prior to payment of all project expenses, *whether or not* all such expenses are thereafter paid. The Tenth Circuit also reached this result respecting the New Mexico statute in *Allen v. Romero (In re Romero),* 535 F.2d 618 (10th Cir.1976). But we distinguished *Romero* and declined to follow it in *Angelle, supra,* at 1340 n. 11, and the Ninth Circuit also rejected *Romero. Pedrazzini, supra,* at 759 (agreeing with "the Fifth Circuit's criticism" of *Romero* ).

In *Angelle,* we discussed *Besroi Construction Corp. v. Kawczynski (In re Kawczynski),* 442 F.Supp. 413 (W.D.N.Y. 1977), in which the district court found a contractor to be a fiduciary for purposes of the debt discharge exception under the New York statute, which in addition to providing for criminal penalties "requires a contractor to keep detailed records of advances and to segregate funds advanced." *Angelle, supra,* at 1339.

We also recognize that the bankruptcy courts have in some cases held state lien statutes effective to create a trust for debt discharge purposes. *Wilmington Trust Co. v. Martin (In re Martin),* 35 B.R. 982 (Bankr.E.D.Pa.1984), specifically noted that freedom to commingle funds is a factor weighing against finding a trust existed. *Id.* at 986. Even though the Delaware statute at issue was facially only penal in nature and did not require fund segrega-

tion, it did prohibit nonproject use of the funds prior to paying all project expenses and its penal provisions did not require an intent to defraud. *Id.* at n. 4. The court held it was sufficiently similar to the Oklahoma statute addressed in *Carey* to support finding that it created a fiduciary relationship. *Id.* at 988. Finally, *Capital Aggregates, Inc. v. Waters (In re Waters),* 20 B.R. 277 (Bankr.W.D.Tex.1982), held that intent was not an essential element of defalcation, that the Texas Act created a trust, and that a debt arising after construction funds were commingled was nondischargeable even when the defalcation alleged was a mere failure to account for funds. The court also came to a conclusion we view as unfounded—that "the Texas Statute [is] even more exacting in its definition of the trust res and duties of the trustee than its Oklahoma counterpart." *Id.* at 279.

### III.

Our resolution of this case arises from our examination of the precise duties imposed on a fund holder by the Texas statute. Although the statute labels these funds as "trust funds," this label does not carry the day, because the "scope of the concept fiduciary under [11 U.S.C. § 523(a)(4)] is a question of federal law." *Angelle, supra,* at 1338.

■ Our review of the Texas statute and decisions interpreting it reveal that the statute may serve several purposes for state law, but state-law rights created by the statute do not control the issue before us. Further, the Texas statute provides that the Texas Trust Act, governing trusts generally (other than constructive or resulting trusts) is inapplicable to it. The actual *fiduciary* duties imposed by the construction fund statute amount to only a single restriction: the fund holder may not, *"with intent to defraud,"* use such funds for other purposes without first fully paying all obligations to the named classes of claimants. Only the diversion of funds *"with intent to defraud"* triggers the criminal provisions of this statute, and it does so regardless of whether the builder subsequently pays all project claims (unlike the statute in *Angelle*). Under the Texas statute, such a fraudulent "diversion" is *wrongful when made* by, for example, the corporate officer, notwithstanding that thereafter the corporate builder may pay all project claims. By contrast, where the builder later pays the claims, the nonfraudulent "diverter" is untouched by the Texas statute. Although the statute has been construed to put a nonfraudulent diverter in the position of a personal guarantor, that is not equivalent to holding that nonfraudulent "diversion" is itself *wrongful,* as we believe is required by section 523(a)(4).

If no fraudulent intent exists, the Texas statute does not prohibit or make wrongful the contractor's mere use of the funds other than on the project for which the funds were provided or loaned; it does not require any segregation of funds; it does not obligate the fund holder to maintain the separate identity of any trust res; it imposes no bookkeeping obligations on the fund holder. And it does not allow a personal liability claim if the contractor uses all the "red" dollars loaned to pay bills arising from the "yellow" project so long as he expends on the "red" project an amount equal to the total of funds advanced. *Cf. Dixie Masonry, supra.* In these respects, the Texas statute is distinguishable on its face from the Oklahoma statute in *Carey* and the New York statute in *Kawczynski,* both of which were found effective to create a trust for purposes of the debt discharge exception. Oklahoma's statute specifically forbade any diversion of construction funds, with or without fraudulent intent and whether or not the project expenses were subsequently paid, and New York's statute required fund holders to segregate construction funds.

Following the example of the Ninth Circuit, we have studied the Texas construction funds statute to determine "whether true fiduciary responsibilities have been imposed." *Pedrazzini, supra,* at 758 n. 2. As *Angelle* teaches, for this purpose we

must look to whether the "diversion" was *wrongful* when done, not to what the results are if subsequently some project debts are not paid. Under the Texas statute, the "diversion" is *wrongful when done only* if it is done with intent to defraud. Otherwise, the sole consequence—and this resulting from judicial construction rather than express statutory provisions—is that the "diverter" becomes a personal guarantor. If the claims are paid by the corporate builder, this status may be immaterial; but if they are not, this does not mean that the nonfraudulent diversion was *wrongful when made. Angelle.*

There being no finding or evidence of fraud on Boyle's part, nor any basis for any theory of fiduciary defalcation other than the Texas statute itself, we hold that it was error to sustain Abilene Lumber's objection to the discharge of these debts of Boyle.

Accordingly, we reverse the courts below and order that appellee's objections to the discharge of these debts of Boyle be denied.

REVERSED.