In re ML & ASSOCIATES, INC., Debtor.

James W. Cunningham, Trustee, Plaintiff,

v.

T & R Demolition, Inc., Defendants.

Bankruptcy No. 00–37462–SAF–7. Adversary No. 02–3543.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Oct. 14, 2003.

Rod L. Poirot, Cavazos, Hendricks and Poirot, P.C., Dallas, TX, for Plaintiff.

Mark A. Herndon, Spencer Herndon P.C., Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

In this adversary proceeding, James W. Cunningham, the Chapter 7 trustee of the bankruptcy estate of ML & Associates, Inc., the debtor, seeks, under 11 U.S.C. §§ 547(b) and 550, to avoid and recover a transfer of $62,182.44 made by the debtor to T & R Demolition, Inc.[1] T & R responds that the debtor did not transfer its property to T & R and that the transfer had been made in the ordinary course of business. The court conducted a trial on September 16 and 19, 2003.

This adversary proceeding raises a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(F) and 1334. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

### Section 547(b)

Section 547(b) provides, in pertinent part:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

ML & Associates, a general contractor, contracted with T & R for excavation work at a publicly-financed commercial construction project in McKinney, Texas. T & R performed excavation services. On July 25, 2000, T & R requested a draw of $6,244.38. On August 23, 2000, T & R requested a draw of $55,938.06. ML & Associates paid those draws by a single check in the amount of $62,182.44, check no. 23450, dated October 12, 2000. The check cleared ML & Associates' bank account on November 13, 2000. ML & Associates filed its bankruptcy petition on November 21, 2000.

ML & Associates made the transfer to and for the benefit of T & R, a creditor, on account of an antecedent debt owed before the transfer was made. ML & Associates made the transfer within ninety days of the filing of its bankruptcy petition.

---

1. Cunningham's complaint also includes an allegation under 11 U.S.C. § 548, but Cun-ningham has abandoned this allegation.

T & R contends, however, that ML & Associates did not transfer "an interest of the debtor in property," that ML & Associates was not insolvent, and that T & R did not receive more than it would have received had ML & Associates filed a case under Chapter 7.

### Debtor's Interest in Property

■ Generally, ML & Associates deposited funds from payments on its projects in a money market account. Sometimes, funds were deposited into its payroll account or its checking account. ML & Associates made the transfer to T & R from its general operating bank account. As a result, Cunningham has presumptively established that ML & Associates transferred "an interest of the debtor in property." *Southmark Corp. v. Grosz (Matter of Southmark Corp.)*, 49 F.3d 1111, 1116–17 (5th Cir.1995).

■ T & R contends that under section 162 of the Texas Property Code, ML & Associates held the funds in trust for T & R. As trust funds, ML & Associates would not have an interest in the funds. Section 162.001(a) of the Texas Property Code states, "Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state." Tex. Prop.Code § 162.001(a).

"A contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds." Tex. Prop.Code § 162.002. "An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust fund paid or received in connection with the improvement." Tex. Prop.Code § 162.003. "The Texas Trust Act ... does not apply to any trust created under this chapter...." Tex. Prop.Code § 162.004.

Cunningham responds that the funds paid to T & R were not trust funds under the Texas Property Code and were property of the debtor's estate. Citing *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583, 592 (5th Cir.1987) and *Texas Lottery Comm. v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir.1998), Cunningham argues that "the mere fact that a statute labels funds as 'trust funds' does not make them such ..., and a state cannot magically transform ordinary agents, *contractors* or sellers into fiduciaries by the simple incantation of the terms 'trust' or 'fiduciary.'" Trustee's Trial Brief in Opposition to Any Affirmative Defense Based on the Texas Construction Trust Fund Statute, p. 6.

The court does not agree with the trustee. Section 162.001 makes construction payments, such as the one from ML & Associates to T & R, trust funds, albeit with limited fiduciary duties required of the trustee.

The Fifth Circuit, in *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, stated:

> The actual *fiduciary* duties imposed by the construction fund statute amount to only a single restriction: the fund holder may not, '*with intent to defraud,*' use such funds for other purposes without first fully paying all obligations to the named classes of claimants. Only the diversion of funds '*with intent to defraud*' triggers the criminal provisions of this statute, and it does so regardless of whether the builder subsequently pays all project claims....

*Boyle v. Abilene Lumber, Inc. (In re Boyle),* 819 F.2d 583, 586 (5th Cir.1987).[2]

This case does not involve a breach of any duty imposed by the statute. Rather, T & R contends that as trust funds, ML & Associates did not have an interest in the funds transferred to T & R. To succeed in this position, T & R must establish that ML & Associates transferred funds it received on the McKinney project.

ML & Associates did not maintain separate bank accounts for each construction project. ML & Associates did not deposit payments it received on the McKinney project in a segregated account for subcontractors on the McKinney project.

The Fifth Circuit also noted that the construction fund statute:

> contains no provision requiring the fund holder to segregate funds by source and project; it does not prohibit the commingling of funds; it does not bar use of funds provided for one project to pay bills incurred on another project if this is done without an 'intent to defraud'; and it does not prohibit a fund holder from paying, without any fraudulent intent, creditors on one project with surplus funds left over from earlier work and then using the funds provided for that later project on still other work. In short, the statute does not create 'red,' 'blue,' and 'yellow' dollars each of which can only be used for the 'red,' 'blue,' or 'yellow' construction project.

*Boyle,* 819 F.2d at 586.[3]

The contract between ML & Associates and T & R did not require that the payments from the City of McKinney for the project be segregated. The contract did not provide that the funds be held in trust for T & R.

Consequently, even though the statute imposes a trust on McKinney project payments to ML & Associates, ML & Associates commingled those funds with other non-McKinney project trust funds in ML & Associates' general bank account. Consequently, for T & R to now succeed in its claim that the funds it received in the transfer were funds held for it in trust by ML & Associates and not property of ML & Associates' estate, T & R must trace the funds. *See Cunningham v. Brown,* 265 U.S. 1, 11, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (defendants "must trace the money"). T & R presented no evidence that the funds it received from ML & Associates could be traced. Because T & R cannot trace McKinney project payments through the commingled bank accounts, T & R failed to show that the funds it received were trust funds. As a result, T & R failed to rebut the *Southmark* presumption. Accordingly, the court finds that ML & Associates transferred an interest of the debtor in property.

### Section 547(b)(3); Insolvency

T & R next contends that ML & Associates was not insolvent on the date of the transfer. The Bankruptcy Code presumes that ML & Associates was insolvent within ninety days of the filing of the bankruptcy petition. 11 U.S.C. § 547(f). T & R may rebut that presumption. *See GasMark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp.,* 158 F.3d 312,

---

**2.** *Boyle* was decided before revisions were made to section 162.031 of the Texas Property Code. The current wording provides that there is misapplication of funds not only when the trustee diverts funds "with intent to defraud" but also when the trustee does so "intentionally or knowingly."

**3.** The court does not address whether the failure to segregate funds by construction project undermines the efficacy of the statute.

315 (5th Cir.1998). Cunningham relies on the presumption.

■ T & R attempted to rebut the presumption by presenting evidence of the value of the payment and performance bonds purchased by ML & Associates for its public works projects. Robert Caudill, a general contractor who also performs subcontracting work for road construction, testified that payment and performance bonds help general contractors obtain public construction projects. This testimony does not rebut the presumption of insolvency. On the asset side, ML & Associates had its contracts. To the extent that the bonds helped ML & Associates obtain those contracts, the contracts already reflected that value. On the liability side, to the extent the bond paid a subcontract debt, it merely substituted one unsecured debt for another. The presumption of insolvency applies.

### *Section 547(b)(5); Chapter 7 Recovery*

■ In order for Cunningham to avoid and recover the transfer, Cunningham must prove that the transfer enabled T & R to receive more than T & R "would receive if (A) the case were a case under chapter 7 ...; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b)(5). *See also* 11 U.S.C. § 547(g)(placing the burden of proving the avoidability of a transfer under subsection (b) on the trustee). Section 547(b)(5) is commonly referred to as "the greater percentage test." *See, e.g., In re El Paso Refinery, L.P.,* 171 F.3d 249, 253–54 (5th Cir.1999).

ML & Associates secured a payment bond for the construction project for the city of McKinney, Texas, from Hartford Fire Insurance Company. At trial, the parties, while acknowledging the existence of the payment bond from Hartford, did not present the court with a copy of the bond agreement. T & R's trial exhibits E and F contain documents related to a claim that T & R made to Hartford on the payment bond in December 2000. However, the payment bond itself is attached as an exhibit to Hartford's proof of claim, filed in ML & Associates' main bankruptcy case and numbered claim 230.

T & R contends that under Chapter 2253 of the Texas Government Code, titled "Public Work Performance and Payment Bonds," T & R held a secured claim. T & R argues that, as a secured creditor, T & R would have been paid the full $62,182.44 in a Chapter 7 case. Consequently, it argues that it did not receive a greater percentage by the pre-petition transfer than it would have received in a Chapter 7 case. T & R's argument is not correct in its details, but is correct in its conclusion.

Chapter 2253(B) of the Texas Government Code provides:

(a) A governmental entity that makes a public work contract with a prime contractor shall require the contractor, before beginning the work, to execute to the governmental entity:

(1) a performance bond if the contract is in excess of $100,000; and

(2) a payment bond if the contract is in excess of $25,000.

(b) The performance bond is:

(1) solely for the protection of the state or governmental entity awarding the public work contract;

(2) in the amount of the contract; and

(3) conditioned on the faithful performance of the work in accordance with the plans, specifications, and contract documents.

(c) The payment bond is:

(1) solely for the protection and use of payment bond beneficiaries who have a direct contractual relationship with the prime contractor or a subcontractor to supply public work labor or material; and

(2) in the amount of the contract.

(d) A bond required by this section must be executed by a corporate surety in accordance with Section 1, Chapter 87, Acts of the 56th Legislature, Regular Session, 1959 (Article 7.19–1, Vernon's Texas Insurance Code).

Tex. Gov't Code § 2253.021(a)-(d) (2003).

A payment bond as contemplated by section 2253 of the Texas Government Code provides to a subcontractor such as T & R a security for payment. Section 2253 does not give T & R a security interest in property of the debtor; however, section 2253 gives T & R a surety for payment through the bond.

In its review of the reason for a statute like section 2253, the Court of Appeals of Texas stated, "The McGregor Act[4] was enacted to protect laborers and materialmen who work on or supply materials for the construction of public improvements. As a practical matter, the payment bond mandated by the Act is a form of 'security,' guaranteeing that laborers and materialmen will be paid." *J.W.D., Inc. v. Federal Ins. Co.*, 806 S.W.2d 327, 329 (Tex.App.-Austin 1991) (citations omitted). ML & Associates would continue to be obligated to pay T & R the funds owed to T & R until either ML & Associates paid T & R the amounts owed or until T & R received the funds from the payment bond. Once T & R received the funds owed to it, whether from ML & Associates' account or from the payment bond, ML & Associates' obligation to pay T & R would be extinguished. If the payment were made from the payment bond, ML & Associates would then be obligated to pay Hartford the amount disbursed to T & R from the payment bond.

■ Effectively, the bond assured T & R that it would be paid. But the bond did not make T & R a secured creditor of the debtor. T & R produced no evidence of a security agreement with the debtor. T & R would be an unsecured creditor with regard to the debtor if not paid pre-petition.

■ But that merely begs the question. The court must construct a hypothetical Chapter 7 liquidation on the petition date, assuming the transfer had not been made. Upon the filing of the bankruptcy petition, the court would apply 11 U.S.C. §§ 501 and 502 to determine claims against the bankruptcy estate. T & R would have had two unpaid draws or invoices totaling $62,182.44. The payment of the invoices would have been assured by the performance and payment bond. In constructing a hypothetical Chapter 7 case, the court must assume that persons would act in a commercially reasonable and businesslike manner. Had ML & Associates not paid the invoices, T & R would have asserted its claim against the bond. Hartford would have paid the claim. The T & R invoices would have been paid in full, albeit by Hartford. Hartford would thereupon have an unsecured claim to assert under § 501. But T & R would not have a basis to file a claim under § 501. T & R would have been paid 100% of its two invoices. T & R would have received no payment from the estate in a hypothetical Chapter 7 case. 11 U.S.C. § 547(b)(5)(C). T & R will receive no payment from the actual estate. T & R was paid 100% by the transfer. T

---

4. "The current version of the McGregor Act can be found in chapter 2253 of the Texas Government Code." *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 392 n. 1 (Tex.1997).

& R would have been paid 100% without the transfer, albeit by Hartford and not by the debtor. The trustee has not established that T & R received more than it would have received had the transfer not been made. As a result, § 547(b)(5) has not been met.

Without establishing each of the five elements of § 547(b), the transfer cannot be avoided.

The trustee contends that the court should not consider the availability of the bond to pay T & R. The trustee asserts that shielding T & R from a preference judgment would be unfair to the unsecured subcontractors who did not get paid by the debtor. The evidence before the court does not address whether any subcontractor on the McKinney project has not been paid by the Hartford bond. The court has no reason to believe that similarly situated creditors on the McKinney project would not have been similarly treated. The court does not address the effect on the Hartford claim against ML & Associates. Hartford contracted for the risk that ML & Associates would not pay the subcontractors, thereby forcing Hartford to pay on the bond. The court does not perceive an equity argument for the trustee to recover from a subcontractor paid by the bond, to create a dividend for a Hartford claim. That undercuts the very purpose of the bond. Section 547 was not created to underwrite the insurance companies' risk assessments. In any event, the trustee must establish each requirement of § 547(b) to avoid a transfer. Simply put, T & R did not receive more than it would have received had the transfer not been made and a Chapter 7 case filed. That the payment came from a payment bond, rather than from the debtor, does not change that fact. The court cannot construct a hypothetical Chapter 7 case on the assumption that commercially reasonable ac-

tions would not be taken in the marketplace. No subrogation issue was asserted in the pretrial order. Hartford contracted for the risks.

### Section 547(c)(2); Ordinary Course of Business Defense

Preferential transfers made in the ordinary course of business may not be avoided. T & R contends that the transfer had been made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

Section 547(c)(2) provides:

The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c).

T & R has the burden of proving the ordinary course of business defense. 11 U.S.C. § 547(g).

Under the first prong of the ordinary course test, § 547(c)(2)(A), T & R must establish that the debtor incurred the debt in the ordinary course of ML & Associates' and T & R's business or financial affairs.

■ ML & Associates was a general contractor on commercial public construction projects. To perform its work, ML & Associates customarily subcontracted specific functions, including site preparation and excavation. T & R is a subcontractor in the site preparation and excavation business. ML & Associates entered a contract with T & R for site preparation and exca-

vation work. T & R performed work under that contract. ML & Associates subcontracted with T & R in the ordinary course of ML & Associates' business. T & R has therefore established that the debt was incurred in the ordinary course of ML & Associates' and T & R's business affairs.

■ Under the second prong of the ordinary course test, T & R must establish that the payments were made in the ordinary course of its and ML & Associates' business or financial affairs. 11 U.S.C. § 547(c)(2)(B). The Bankruptcy Code does not impose a precise legal test for whether payments have been made in the ordinary course of business. *GasMark,* 158 F.3d at 317–18. Accordingly, courts focus on the time within which the debtor ordinarily paid the creditor and whether the timing of payments during the preference period demonstrated some consistency with that practice. *Id.* The court must also compare prior dealings between the debtor and the creditor with their dealings during the preference period to determine whether the challenged dealings were ordinary. *Mossay v. Hallwood Petroleum, Inc.,* No. Civ.A.3:96–CV–2898, 1997 WL 222921, at *4 (N.D.Tex. Apr.28, 1997). The court considers the timing of the payments, the amount and manner in which the transaction was paid and the circumstances under which the transfer was made. *Id.*

■ The parties had no prior dealings. They entered their first contractual arrangement on the McKinney project. Robert Moore, a part owner and vice president of T & R, testified that his firm customarily performs site preparation and excavation work. T & R performed that work on the McKinney project. He testified that T & R entered a subcontract with ML & Associates.

The contract, dated July 26, 2000, provided the payment terms under paragraphs 11.1, 11.2 and 11.3. Moore testified that T & R customarily received payments under contracts with similar terms. Paragraph 11.2 provides that draws shall be for one calendar month ending the last day of the month, and paragraph 11.3 provides for submitting draws on the 25th day of the month. The first draw was submitted July 25 and the second draw, August 23. The first draw did not cover a full prior month since T & R began its work in late July. Moore testified that typically the first draw would cover the initial period of work.

■ Moore testified that general contractors typically paid the draw requests within thirty to sixty days. Gloria Velasquez, T & R's CPA, testified that the majority of draws on construction projects were actually paid between thirty and forty-five days, with a smaller number paid between forty-five to sixty days. ML & Associates paid the draws by check dated October 12, 2000, and delivered October 13, 2000. T & R did not deposit the check until November 13, 2000. Cunningham contends that the late deposit establishes that T & R did not act consistently with its ordinary business practice. However, the court employs the date of delivery of the check, not the date of deposit, when characterizing the payment from ML & Associates to T & R. "Those Courts of Appeals to have considered the issue are unanimous in concluding that a 'date of delivery' rule should apply to check payments for purposes of § 547(c)." *Barnhill v. Johnson,* 503 U.S. 393, 402 n. 9, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). *See also Braniff Airways, Inc. v. Midwest Corp.,* 873 F.2d 805 (5th Cir.1989) (holding that for purposes of the ordinary course of business exception to the trustee's preference-avoiding powers, payment by check occurred on the date the check was delivered).

Moore testified that he personally picked up the check from ML & Associates on October 13, 2000. The court finds that October 13, 2000, the date the check was delivered to T & R, is the date of payment for purposes of determining the time between invoice and the date of payment. Accordingly, the first draw, dated July 25, 2000, was paid eighty days after the invoice; the second draw, dated August 23, 2000, was paid fifty-one days after the invoice. The first draw was therefore outside the ordinary course of payments to T & R but the second draw was paid within the ordinary course. However, Moore testified that, in his experience dealing with general contractors, the first draw for initial work was often paid with the second draw, which covers a full month of work. The trustee presented no contradictory evidence.

ML & Associates required that T & R execute a partial release or waiver of lien before releasing the check. The waiver of lien applies to the subcontractor's claims against the property and the performance and payment bond. Cunningham testified that he understood that ML & Associates required waivers of liens before releasing payments. Moore signed the release of bond and waiver at ML & Associates' office on October 13, 2000. ML & Associates required that the waiver be executed in conjunction with payment. Moore testified that was typical. He testified that he personally picked up checks seventy-five percent of the time. Velasquez confirmed this practice.

Cunningham observed that T & R's bookkeeper attempted to collect the invoices beginning September 19, 2000. Moore testified that the bookkeeper regularly began discussions with the general contractor during the thirty to sixty day period after the invoice. Velasquez con-

firmed that the bookkeeper regularly performed that function.

Cunningham testified that he found four aspects of the transfer unusual based on his review of how ML & Associates operated: (1) the date the check cleared ML & Associates' bank; (2) the payment of two draws or invoices by one check; (3) the drafting and voiding of an earlier check; and (4) the collection efforts by T & R. The date the check cleared ML & Associates' bank does not figure into the analysis of the ordinary course defense. *Barnhill,* 503 U.S. at 402 n. 9, 112 S.Ct. 1386. The collection efforts do not inform the court of ML & Associates' practices. The efforts were consistent with T & R's practices. The payment of two invoices by one check does not appear to be unusual when the subcontractor performs a relatively small amount of work to support an initial draw. There is no evidence explaining why ML & Associates wrote a check around October 5, 2000, and then voided that check.

Cunningham acknowledged that ML & Associates performed as a general contractor by subcontracting its work. ML & Associates incurred the T & R debt in the ordinary course of ML & Associates' business. Cunningham further testified that there was nothing unusual in the contractual terms between ML & Associates and T & R. Cunningham had no reason to think that T & R had not performed the work to support the invoices.

ML & Associates obtained its income from construction projects. ML & Associates did not maintain separate accounts per project. Instead, ML & Associates commingled the funds in its bank accounts and paid for the subcontractors from the commingled funds. ML & Associates' contract with T & R provides for progress payments, with ML & Associates obligated to pay within ten days of receipt of payment from the owner of the project. Even

though ML & Associates commingled funds, the evidence suggests that ML & Associates paid T & R two or three days after depositing a payment from the City of McKinney for the McKinney project. The timing of the payment to T & R appears consistent with ML & Associates' ordinary practice.

T & R has established that the payment had been made in the ordinary course of T & R's and ML & Associates' business affairs.

 Under the third prong of the ordinary course test, T & R must establish that the transfer had been made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). To meet that burden, T & R must establish the customary terms and conditions used by other enterprises in the same industry facing the same or similar problems. The court must analyze whether the transfers were made according to ordinary business terms using an objective standard. *Gulf City Seafoods, Inc., v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 369–70 (5th Cir.2002). "[T]he question must be resolved by consideration of the practices in the industry—not by the parties' dealings with each other." *Id.* at 369. Dealings outside the range of practices in the industry would be outside the ordinary business terms of § 547(c)(2)(C).

 To establish an industry standard as a rough benchmark, "the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product." 296 F.3d at 369.

 Caudill testified on behalf of T & R on the industry standard. Caudill has eighteen years of experience as a project manager for a concrete paving contractor that works on publicly-financed construction projects as both a general contractor

and a subcontractor. Most of the projects include payment and performance bonds. His experience includes the administration of construction contracts on public projects. Caudill's experience qualifies him to testify about the payment arrangements between general contractors and subcontractors on public projects, albeit from the perspective of highway and other pavement projects. The court infers that general contractors on public projects using excavation subcontractors perform similarly. His experience has been in the Dallas/Fort Worth Metroplex.

Caudill testified that subcontractors with his firm typically submit draws or invoices on the 25th of each month. When his firm is a subcontractor, the firm submits draws or invoices on the 25th of each month. He testified that subcontractor draws are typically paid about four to five days after depositing a payment from the owner to the general contractor. The subcontractors are typically paid thirty to sixty days from the submission of the draw request or invoice. Velasquez, who has other clients in the construction industry besides T & R, confirmed this range. Caudill also testified that when the first subcontractor draw on a project involved a relatively small amount of work, the general contractor commonly paid the draw with the payment of the second draw request. That situation typically occurs when the subcontractor begins its work close to the contractual time to submit a draw request.

To be paid for a draw request or invoice, the subcontractor must execute a partial waiver or release of liens on the project, including the payment and performance bond. Caudill's firm requires that the subcontractor physically pick up the check if the subcontractor has not previously executed the lien waiver. When his firm acts as a subcontractor, it typically calls the general contractor for payment status, and

it often physically picks up the check. When T & R has contracted with his firm, T & R has called for payment status.

Caudill testified that his firm commingles payments from the owners of various projects and pays subcontractors from commingled accounts. Caudill also testified that T & R's contract with ML & Associates, including the payment provisions, was similar to the contracts used by his firm. Based on his experience, Caudill testified that paragraphs 11.1, 11.2 and 11.3 of the contract were customary subcontractor provisions in the Dallas/Fort Worth Metroplex.

The only reasonable inference to be drawn from this evidence is that ML & Associates was a commonly situated general contractor in the commercial publicly-financed construction industry in the Dallas Fort Worth Metroplex. *Gulf City Seafoods,* 296 F.3d at 369. T & R has therefore established that the transfer had been made according to ordinary business terms.

Each of the elements of § 547(c) having been established, if the transfer had been a preference under § 547(b), the trustee could not avoid the transfer because it had been made in the ordinary course of business.

### Order

Based on the foregoing, Cunningham, the Chapter 7 trustee, has not established that the transfer can be avoided as a preference under § 547(b). In addition, if the transfer is a preference under § 547(b), T & R has established that the transfer cannot be avoided because it had been made in the ordinary course of business.

Accordingly,

**IT IS ORDERED** that the complaint is **DISMISSED.**

T & R requests recovery of attorney's fees for defending the adversary proceed-ing. The Bankruptcy Code does not expressly provided for an award of attorney's fees for a defendant in an avoidance action. Consequently, the request is denied.