# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50023

United States Court of Appeals
Fifth Circuit

**FILED**

January 23, 2015

Lyle W. Cayce
Clerk

In the Matter of:  BARRY JOE PLEDGER,

Debtor

------------------------------

RATLIFF READY-MIX, L.P.,

Appellant

v.

BARRY JOE PLEDGER,

Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No.  6:13-CV-377

Before STEWART, Chief Judge, and JONES and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Barry Joe Pledger ("Pledger") filed for Chapter 7 Bankruptcy and attempted to discharge a debt that was owed to Ratliff Ready-Mix, L.P.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-50023

("Ratliff").  Ratliff filed an adversary proceeding against Pledger, alleging that the debt resulted from fraud or defalcation while acting in a fiduciary capacity and was therefore nondischargeable pursuant to 11 U.S.C. § 523(a)(4).  Ratliff argued to the bankruptcy court that Pledger's fiduciary duty to Ratliff arose—and was subsequently breached—when Pledger misapplied funds as described in the Texas Construction Trust Fund Statute ("Trust Fund Statute").  Tex. Property Code § 162.031.  Both the bankruptcy court and district court held that 11 U.S.C. § 523(a)(4) did not render the debt nondischargeable because Pledger's use of the funds was covered by an affirmative defense in the Trust Fund.  We AFFIRM.

## BACKGROUND

Pledger is the former President and CEO of Pledger Construction Company ("Pledger Construction"), which contracted with Ratliff between March 6, 2009, and December 10, 2009, for the supply of concrete to be used in Pledger Construction's ongoing projects.  Although their relationship spanned dozens of projects, only three are at issue in this case: (1) the L-3 Communications project, (2) the Midway High School project, and (3) the Waco High School project.   Ratliff was paid in full for all other jobs.

For the L-3 Communications project, Ratliff supplied Pledger Construction with $230,940 worth of concrete.   Pledger Construction's total costs for the project, including the cost of the concrete, were $776,211.  The upstream general contractor on the project paid Pledger Construction $952,850, the full contract amount for the L-3 Communications project.

For the Midway High School project, Pledger Construction received from Ratliff $73,473 worth of concrete.    Including the concrete, Pledger Construction's costs for the project were $331,340.  Pledger Construction received the full contract amount of $372,890 from the general contractor.

2

No. 14-50023

For the Waco High School project, Ratliff provided $39,094 worth of concrete. Pledger Construction's total costs, including concrete, were $108,479. Pledger Construction received full payment for the job in the amount of $139,200.

In sum, Pledger Construction took in $1,464,940 in revenue for the three projects. The company also incurred $1,216,030 of costs. Had Ratliff been paid, Pledger Construction would have made a gross profit of $248,910. But Pledger Construction's cost figures did not account for overhead, which included costs like vehicle repairs, telephone bills, and employee compensation. Nor did those figures capture the overall health of the company, since many other projects had negative gross profits, even before overhead costs were calculated. Financial statements showed that Pledger Construction lost $584,567 for the twelve months that ended May 31, 2010, and $277,713 for the twelve months that ended May 31, 2009. Due to mounting losses, Pledger had difficulty paying all of the subcontractors, but he stated in his deposition that he tried to make the best of a bad situation by paying as many subcontractors as he could.

Ultimately, all of the subcontractors besides Ratliff were entirely paid in full. Ratliff remains unpaid for the L-3 Communications project and the high school projects, but was paid in full for all other projects during the relevant time period. Pledger stated that he knew he could not afford to pay all of the subcontractors at once and determined that if anyone could temporarily withstand a late payment, it would be a "big dog" like Ratliff. Ratliff released all liens and bond claims related to the projects and allowed Pledger Construction to convert the indebtedness into a promissory note that was personally guaranteed by Pledger.

Pledger's personal finances forced him to file for Chapter 7 bankruptcy protection in October of 2011. Ratliff filed an adversary proceeding the

following January to request that the debt be deemed nondischargeable under 11 U.S.C. § 523(a)(4) (non- dischargeability of debts for "for fraud or defalcation while acting in a fiduciary capacity"). Ratliff asserted that the Trust Fund Statute created Pledger's fiduciary duty, the breach of which supported nondischargeability under title 11.

The bankruptcy court initially granted Ratliff's partial summary judgment motion on the nondischargeability claim, but upon reconsideration, reversed its prior order and ruled in favor of Pledger. Ratliff filed an interlocutory appeal to the district court, which affirmed the bankruptcy court and remanded. After the bankruptcy court entered a final judgment, Ratliff appealed once again to the district court, which adopted its previous interlocutory order as a final judgment and again affirmed the bankruptcy court's order. This timely appeal followed.

## STANDARD OF REVIEW

We review *de novo* a district court's decision affirming a bankruptcy court's application of the law. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307–08 (5th Cir. 1985). The facts in this case are undisputed.

## DISCUSSION

Among the Bankruptcy Code's exceptions to dischargeability of debts is Section 523(a)(4), which prevents discharge of "any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "Defalcation includes the failure to produce funds entrusted to a fiduciary, even where such conduct does not reach the level of fraud." *In re Swor*, 347 Fed.Appx. 113, 116 (5th Cir. 2009).

The Trust Fund Statute is one way in which the relevant "fiduciary capacity" under Section 523 may be created. *In re Nicholas*, 956 F.2d 110, 114 (5th Cir. 1992). The statute requires payments for construction contracts for the improvement of real property to be treated as "trust funds." Tex. Property

Code § 162.001. The recipient of those funds is the "trustee," and the subcontractors to whom the funds are owed are the beneficiaries. *Id.* at §§ 162.001–003. Trustees, including the officers of companies, who misapply trust funds may face criminal penalties. *Id.* at §§ 162.031–032. In *Nicholas*, this court analyzed the statute and determined that the requirement of a trust fund, with rules covering how the funds may be spent, "creates fiduciary duties encompassed by 11 U.S.C. § 523(a)(4)." *Nicholas*, 956 F.2d at 114. But the statute only creates a fiduciary duty to the extent that activity is wrongful under the statute. *Id.* For purposes of Section 523(a)(4), a fiduciary duty only arises if there is a simultaneous wrongful misapplication of funds.

The statutory language defining a misapplication of funds was changed in 1987. This court addressed the pre-amendment version of the statute in *Matter of Boyle*, 819 F.2d 583 (5th Cir. 1987). At that time, Section 162.031(a) stated that "a trustee who, *with intent to defraud*, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all obligations incurred by the trustee to the beneficiaries of the trust funds has misapplied the trust funds." *Boyle*, 819 F.2d at 586 (emphasis added). That misapplication standard, however, was subject to an exception in Section 162.031(b), which exempted the use of "trust funds to pay the trustee's reasonable overhead expenses that are directly related to the construction or repair of the improvement." In 1987, the statute was amended in two relevant ways: (1) the scienter requirement was lowered from "intent to defraud" to "intentionally or knowingly or with intent to defraud," and (2) the "overhead" exception was changed to an affirmative defense and the phrase "reasonable overhead expenses" was changed to "actual expenses." Tex. Property Code § 162.031. This court has had two occasions to address the changes to the Texas statute.

In *Nicholas*, this court considered whether the lowering of the scienter requirement also broadened the fiduciary responsibilities cognizable under the bankruptcy code. *In re Nicholas*, 956 F.2d 110, 114 (5th Cir. 1992). This court held in *Boyle* that the Texas statute only created fiduciary duties under Section 523 of the Bankruptcy Code to the extent that a trustee should not divert funds with intent to defraud. *Boyle*, 819 F.d2 at 592. In *Nicholas*, a subcontractor argued that the lowered scienter requirement had brought the Texas statute in line with broader construction trust fund statutes in other states that had been held to create a general, broad fiduciary duty. *Nicholas*, 956 F.2d at 113. This court agreed with the subcontractor that the scienter requirement had been lowered to encompass more activity within the statute. But the court also recognized that the "overhead" exception had been changed to cover "actual expenses," thus "refining" the scope of coverage. *Id.* at 112. The "actual expenses" language was interpreted as, at a minimum, continuing the *Boyle* era understanding that contractors could spend money from one project on another to keep the business going. The court also approvingly quoted the bankruptcy court, which read the statute as asking whether the contractor had diverted funds for his own use or some frivolous use not connected with the operation of business. *Id.* at 114. The statute criminalized fewer activities than other trust fund statutes with similar scienter requirements, and therefore did not create a general fiduciary duty. This court held that the statute continued to create a fiduciary duty only to the extent that funds are misapplied, as defined in the statute.

This court revisited the Texas statute in *In re Swor*, 347 Fed.Appx 113 (5th Cir. 2009). The Swors, a bankrupt contractor and his wife, had withdrawn money from the business, claiming that they were repaying loans they had made to the business. The Swors argued that loans were actual expenses directly related to a project and were therefore exempted from the Trust Fund

Statute.  Noting that repayment was made at the Swors' discretion, this court determined that the loans were actually capital contributions.  And withdrawing capital contributions was not permissible under the statute, because it is not an actual expense directly related to a project.  Repaying one's investment is not an expense of a project at all, even indirectly.  In that scenario, withdrawing capital just guided the business towards its eventual bankruptcy.

Before reaching its legal conclusions in *Swor*, this court recognized that under the Texas statute's "actual expenses" exception, trust funds could be spent on "expenses related to general business overhead."  *Swor*, 347 F. App'x at 116.  Though the reference to general overhead had no application in *Swor*, it appears germane to this case.  Accordingly, Ratliff argues that *Swor* incorrectly stated the law by improperly referencing the pre-amendment version of the Texas statute when it cited *Boyle* and used the word "overhead," which had been removed from the statute.  Ratliff contends that changing the statute's exception from "*reasonable overhead* expenses directly related to the construction" to "*actual* expenses directly related to the construction" removed overhead expenses from the scope of the exception to misapplying funds.  That is not the case.  *Swor*, although an unpublished and non-precedential opinion, correctly restated the law as *Nicholas*, a published opinion, interpreted it.

*Swor*'s explanation that trust funds may be spent on general overhead without liability was correct.  First, Ratliff argues that the citation to *Boyle* indicates that general overhead was once covered by the part (b) exception in the statute, but that no longer holds true for the current "actual expenses" affirmative defense.  However, citing *Boyle* does not in and of itself indicate that the principle no longer is correct and that *Swor* was mistaken.  As was stated in *Nicholas*, various aspects of *Boyle*'s statutory interpretation hold true post-1987 amendment.  *See, e.g., Nicholas*, 956 F.2d at 113 ("[G]eneral

contractors may use the payments they receive from construction projects to keep those projects going…. What *Boyle* said still almost precisely describes the Texas statute….").  Second, in *Nicholas*, this court explained that paying for one project with the funds of another project to keep the business going fell within "actual expenses directly related to a project" and was not a misapplication of funds under the Trust Fund Statute. *Id.*  If spending money on a project can be actual expenses directly related to an entirely separate project, then spending on general overhead for a single project surely must also qualify as actual expenses directly related to that project. This is supported by *Nicholas*'s recognition that the scope of activities that qualify as a Part (a) misapplication and the scope of activities that fall under the Part (b) affirmative defenses were expanded by the 1987 amendment.   Therefore, "actual expenses" includes overhead and additional categories not included in the pre-1987 version of the statute.[1]  *Swor* correctly noted that contractors may "spen[d] on other projects or on expenses related to general business overhead" without misapplying trust funds.

But this court has never said that all spending on expenses incurred by the company is automatically within the scope of the "actual expenses" affirmative defense.  Although this statute does not criminalize poor business acumen or misfortune, it also does not absolve the contractor who forces a subcontractor to be a creditor for something frivolous, like a luxury company

---

[1] This also comports with an opinion from the Texas Attorney General and a debate in the Texas legislature.   The Texas Attorney General stated that the change from "reasonable overhead expenses" to "actual expenses" was meant to change the standard from subjective to objective.  It was not meant to narrow the exception.  The Attorney General also directly stated that overhead remained covered by 162.0031(b) after the amendment.  Tex. Atty. Gen. Op. JM–945 (1988).  Similarly, Representative Jim Parker, the author of House Bill No. 1160, stated on the House floor that payroll, vehicle expenses, and administrative expenses were covered under the "actual expenses" language.  Debate on H.B. 1160 on the Floor of the House, 70th Leg., R.S. (May 30, 1987) (Point of Order—Tape 112, Side B)

car. In *Nicholas*, we stressed the acceptability of diverting funds to keep projects alive and approvingly quoted a bankruptcy court opinion that distinguished between a contractor who diverts funds to keep the business going and a contractor who "divert[s] funds for his own use." *Nicholas*, 956 F.2d at 114. A purchase made in the name of a business may still be for a contractor's "own use," resulting in a misapplication of funds, even if it is technically overhead or a bill paid by the business.

Therefore, under *Nicholas*, a creditor claiming Section 523(a)(4) nondischargeability through the Texas Construction Trust Fund Statute must show that (1) the contractor intentionally, knowingly, or with intent to defraud diverted trust funds and (2) the affirmative defenses in the statute do not apply.[2] To disprove the affirmative defense in this case, Ratliff had to establish that the payments made by Pledger were not "actual expenses directly related to the construction." Specifically, Ratliff must show that (a) these were not payments made on the project or overhead, or (b) they were made for Pledger's own uses rather than to benefit the health of his failing business.

Because the parties agree that Pledger intentionally diverted trust funds that should have gone to Ratliff for the L-3 Communications project and the two high school projects, the scienter element is not at issue. The only issues before us are whether Ratliff has proven that (a) these payments were not made on other projects or overhead, or (b) they were made for Pledger's own uses rather than to benefit the health of his failing business, thus establishing that the affirmative defense should not have applied.

---

[2] In the bankruptcy context, the burden is on the creditor to establish that an affirmative defense is inapplicable—rather than on the debtor to establish that one is applicable—because the creditor has the ultimate burden of proving that a debt falls within the scope of 11 U.S.C. § 523(a)(4). *Nicholas*, 956 F.2d at 114.

No. 14-50023

The parties represented to the bankruptcy court that there was no factual issue in dispute. It is undisputed that the diverted funds were used to "pay expenses such as telephone bills, salaries, and other overhead." As already explained, *Nicholas* supports the inclusion of payments for overhead under the "actual expenses" affirmative defense. These payments are all bills for other projects or project overhead and are therefore covered by the affirmative defense.

Ratliff, however, also asserts that the financial records of the three projects show that Pledger made unaccounted profits. Pledger's records detail the costs of each job and the estimated gross profit. The records for each project do not account for overhead, so a positive gross profit does not mean that the project actually made money. Pledger estimated that overhead for each project was roughly an additional 30% of the costs of the job. Ratliff has added up the costs of the L-3 and high school projects and pointed out that 30% of that figure—an approximation of the overhead for those jobs—is less than the sum of the estimated gross profit and money owed to Ratliff—Ratliff's approximation of the amount of money available to Pledger to pay bills. The point of this arithmetic is to contend that Pledger must have pocketed some of the money owed to Ratliff, since his overhead for the three projects was less than the amount of money he obtained from them. But that inference is unfounded.

The fact that the money paid for the three projects at issue—including the amount owed to Ratliff—exceeded the costs for those projects does not mean that his other projects were similarly successful. In fact, the financial records indicate that his company as a whole lost hundreds of thousands of dollars in 2009 and 2010. There were plenty of other leaky holes to plug. Therefore, that Pledger lined his pockets with Ratliff's money does not logically follow from the fact that the money available from the three projects exceeded

costs and estimated overhead. Pledger has maintained that all the money went to paying the bills of the company resulting from overhead and general business expenses and Ratliff has not introduced anything that conflicts with that contention. Since *Nicholas* makes clear that a contractor may borrow from healthy projects to support failing ones in order to keep the business going, all of the transactions were of the type covered by the affirmative defense.

Ratliff's only hope would be to show that Pledger diverted the trust funds for some reason other than the health of the company, even if the money went through the company. But Ratliff has failed to meet that burden. It would be hard to argue that paying taxes, repairing vehicles and equipment, and compensating employees could be categorized as anything other than maintaining the business. The only fact that cuts remotely in Ratliff's favor would be Ratliff's assertion that Pledger made optional 401k payments for his employees, which were unnecessary for the health of the company and somehow called into question Pledger's motivations. But Ratliff does not show why they were optional or how that made them improper:  401k contributions are like any other form of compensation an employer agrees to provide. Pledger could have stopped making those contributions in the same way he could have lowered salaries, but either course might have risked employee resignations. Without more, it would seem any continued 401k contributions would be for the health of the company. Therefore, Ratliff has failed to establish that trust funds were diverted for an improper use.

Accordingly, Ratliff has not shown that the affirmative defense is inapplicable to Pledger and the judgment of the bankruptcy court is **AFFIRMED**.