# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 16, 2023

Lyle W. Cayce
Clerk

No. 22-20407

IN THE MATTER OF STEPHEN HANN, *doing business as* TRINITY CUSTOM BUILDERS, *doing business as* CHRISTIAN BUILDERS, *doing business as* HANN BUILDERS, *doing business as* BETA INVESTMENTS LIMITED, *doing business as* SKH 2000, INCORPORATED, *doing business as* HANN and ASSOCIATES,

*Debtor*,

SAEED KAHKESHANI,

*Appellee*,

*versus*

STEPHEN K. HANN, *doing business as* TRINITY CUSTOM BUILDERS, *doing business as* CHRISTIAN BUILDERS, *doing business as* HANN BUILDERS, *doing business as* BETA INVESTMENTS LIMITED, *doing business as* SKH 2000, INCORPORATED, *doing business as* HANN and ASSOCIATES,

*Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-230

No. 22-20407

Before Wiener, Stewart, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

Appellant, Debtor Stephen K. Hann, appeals the district court's judgment, on appeal from the bankruptcy court, concluding that his debt to Saeed Kahkeshani, relating to a breached residential construction contract, is excepted from discharge by 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). The district court judgment reversed the bankruptcy court's summary judgment determination in Hann's favor. Having carefully considered the applicable law, the parties' arguments, and the record herein, we are not convinced that the district court erred in its resolution of the issues presented in this bankruptcy appeal. Thus, we AFFIRM the district court's determination that Hann's debt to Kahkeshani is rendered nondischargeable by 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).

I.

On or about May 18, 2010, Kahkeshani entered into a residential construction contract with SKH 2000, Inc. d/b/a Hann Builders ("SKH") for a home to be built in Houston, Texas. Hann was the sole officer, director and shareholder of SKH. Kahkeshani paid for the construction with funds loaned by Bank of River Oaks. As work progressed on the project, an employee of SKH submitted "draw requests" to the bank for payments under the contract. The draw requests state: "Contractor hereby requests the below itemized funds from lender for contractor to pay for the listed items, all of which are a part of the construction project at the above referenced Property." The draw requests also contained descriptions of the work (e.g., framing, windows, etc.) and included a representation by SKH that the specific dollar amounts for specific work described in the draw

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

request "[w]ill be paid for." Hann did not sign the draw requests. Nor, apparently, were they sent to him.

Notwithstanding the language included in SKH's draw requests, Hann directed that some of the funds received from Kahkeshani's bank instead be used to pay for expenses on other SKH projects, as well as Hann's personal expenses and debts, and debts owed by Hann's prior business, Hann Builders, Ltd. ("HBL"), which had ceased operation in 2007 or 2008 because it could not generate sufficient revenue. When SKH failed to pay a number of the subcontractors working on the Kahkeshani construction project, liens were filed against Kahkeshani's property. Kahkeshani ultimately discovered that only approximately $193,000 (of the approximately $761,000 he had paid SKH) was used to pay the construction costs for his house.

In February 2011, Kahkeshani sued Hann and SKH in Texas state court, asserting claims for breach of contract, violations of the Texas Construction Trust Fund Act, Tex. Prop. Code, § 162.001, *et seq.*, breach of express trust, common law and statutory fraud, alter ego, piercing the corporate veil, single business enterprise, fraudulent transfer, unjust enrichment, money had and received, constructive trust, and theft. A year later, Hann commenced his Chapter 7 bankruptcy proceeding and removed Kahkeshani's state court suit to the bankruptcy court. *See* Adv. No. 12-03196. In May 2012, Kahkeshani commenced the adversary proceeding underlying this appeal (Adv. No. 12-03256), asserting that his state-law claims resulted in nondischargeable liability against Hann under 11 U.S.C. § 523(a).

In March 2013, Hann invoked the arbitration clause in the construction contract with Kahkeshani and moved to compel arbitration of Kahkeshani's claims. The bankruptcy court ordered arbitration of the claims

in the removed action and the adversary proceeding, and authorized the arbitrator to make findings of fact and conclusions of law on all claims in those cases, but reserved the ability to make the ultimate determination of dischargeability.

During the four-day arbitration hearing, twelve witnesses testified, including Hann and other SKH personnel, and almost sixty exhibits were admitted into evidence. Thereafter, the arbitrator rendered a "Final Arbitral Award on Liability, Damages & Attorneys' Fees[,]" with detailed findings of fact and conclusions of law.  The arbitrator concluded that SKH was liable for breach of the construction contract, violating the Texas Construction Trust Fund Act, Tex. Prop. Code, §§ 162.005(1)(A), 162.031, and fraudulent misrepresentation.

The arbitrator additionally determined that Hann had also violated § 162.005(1)(A) but found insufficient evidence demonstrating that he had personally made any fraudulent misrepresentations to Kahkeshani. Nevertheless, the arbitrator concluded that Hann was liable for SKH's fraudulent misrepresentations as its *alter ego*. The arbitrator awarded damages of $371,972.13, attorney's fees of $200,000, and post-award interest at a rate of 5% in Kahkeshani's favor.[1]  The bankruptcy court confirmed the arbitration award in December 2015.

In mid-2015, the parties submitted cross-motions for summary judgment regarding dischargeability to the bankruptcy court. The only evidence offered in support of Kahkeshani's motion was the arbitrator's award. Hann additionally submitted his own declaration, dated July 21, 2015.

_____

[1] The arbitrator concluded that no violations of the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.001, *et seq*., or the Texas Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.001, *et seq*., had occurred.

No. 22-20407

The bankruptcy court denied Kahkeshani's motion and granted Hann's cross-motion regarding dischargeability. Kahkeshani appealed to the district court.

On July 7, 2022, the district court entered its Opinion on Appeal and Final Judgment. Reversing the bankruptcy court, the district court concluded Kahkeshani's debt was nondischargeable under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4).[2] Hann's appeal to this court followed.

## II.

When reviewing the decision of a district court acting as an appellate court, we "apply[] the same standard of review to the bankruptcy court's conclusions of law and findings of fact that the district court applied." *In re JFK Capital Holdings, L.L.C.*, 880 F.3d 747, 751 (5th Cir. 2018) (quoting *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 270 (5th Cir. 2015) (en banc)). Accordingly, questions of fact are reviewed for clear error and conclusions of law *de novo*. *Matter of Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). Mixed questions of law and fact also are reviewed *de novo*. *Id*. A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." *Matter of Missionary Baptist Found. of Am. Inc.*, 712 F.2d 206, 209 (5th Cir. 1983) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

_____

[2] The district court also remanded the case to the bankruptcy court for further discovery on Kahkeshani's claim seeking to bar Hann's discharge under 11 U.S.C. § 727(a). During the course of this appeal, the parties agreed to "dispose" of the claims asserted regarding the bar to discharge set forth in 11 U.S.C. § 727(a). Thus, only the applicability of the exceptions to discharge provided by 11 U.S.C. § 523(a) remain in dispute.

No. 22-20407

### III.

Section 727 of Title 11 of the United States Code provides for a debtor's discharge of debt, pursuant to Chapter 7 of that title, unless one of several specified exceptions are met. *See* 11 U.S.C. § 727(a). Regarding 11 U.S.C. § 523, subsections 523(a)(2)(A) and 523(a)(4) preclude a discharge "under section 727 . . . from any debt":

> (2) for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

*See* 11 U.S.C. §§ 523(a)(2)(A), (a)(4). [3]

The Texas Construction Trust Fund Act ("TCTFA"), Tex. Prop. Code, § 162.001, *et seq.*, is relevant to § 523(a)(4)'s discharge exception. The TCTFA provides in pertinent part:

> **§ 162.001. Construction Payments and Loan Receipts as Trust Funds**
>
> (a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor,

---

[3] 11 U.S.C. §§ 523(a)(2)(A), (a)(4). Subsection 523(a)(6) also precludes discharge of debt for "willful or malicious injury by the debtor to another entity or to the property of another entity[.]" Having concluded that §§ 523(a)(2)(A) and (a)(4) preclude discharge here, the district court did not review the bankruptcy court's contrary determination regarding § 523(a)(6). Given our agreement with the district court's assessment of §§ 523(a)(2)(A) and (a)(4), we likewise do the same.

under a construction contract for the improvement of specific real property in this state.

## § 162.002. Contractors as Trustees

A contractor, subcontractor, or owner or an officer, director, or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds.

## § 162.003. Beneficiaries of Trust Funds

(a) An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

(b) A property owner is a beneficiary of trust funds described by Section 162.001 in connection with a residential construction contract, including funds deposited into a construction account described by Section 162.006.

## § 162.005. Definitions

In this chapter:

(1) A trustee acts with "intent to defraud" when the trustee:

(A) retains, uses, disburses, or diverts trust funds with the intent to deprive the beneficiaries of the trust funds;

(B) retains, uses, disburses, or diverts trust funds and fails to establish or maintain a construction account as required by Section 162.006 or fails to establish or maintain an account record for the construction account as required by Section 162.007; or

(C) uses, disburses, or diverts trust funds that were paid to the trustee in reliance on an affidavit furnished by the trustee under Section 53.085 if the affidavit contains false

information relating to the trustee's payment of current or past due obligations.

(2) "Current or past due obligations" are those obligations incurred or owed by the trustee for labor or materials furnished in the direct prosecution of the work under the construction contract prior to the receipt of the trust funds and which are due and payable by the trustee no later than 30 days following receipt of the trust funds.

(3) "Direct cost" means a cost included under a construction contract that is specific to the construction of the improvement that is the subject of the contract.

(4) "Indirect cost" means a cost included under a construction contract that is not specific to the construction of the improvement that is the subject of the contract.

(5) "Financial institution" means a bank, savings association, savings bank, credit union, or savings and loan association authorized to do business in the state.

(6) "Construction account" means an account in a financial institution into which only trust funds and funds deposited by the contractor that are necessary to pay charges imposed on the account by the financial institution may be maintained.

## § 162.031. Misapplication of Trust Funds

(a) A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds.

(b) It is an affirmative defense to prosecution or other action brought under Subsection (a) that the trust funds not paid to the beneficiaries of the trust were used by the trustee to pay the trustee's actual expenses directly related to the construction or repair of the improvement[,] or have been retained by the

trustee, after notice to the beneficiary who has made a request for payment, as a result of the trustee's reasonable belief that the beneficiary is not entitled to such funds or have been retained as authorized or required by Chapter 53.

(c) It is also an affirmative defense to prosecution or other action brought under Subsection (a) that the trustee paid the beneficiaries all trust funds which they are entitled to receive no later than 30 days following written notice to the trustee of the filing of a criminal complaint or other notice of a pending criminal investigation.

(d) A trustee who commingles trust funds with other funds in the trustee's possession does not defeat a trust created by this chapter.

### § 162.032. Penalties

(a) A trustee who misapplies trust funds amounting to $500 or more in violation of this chapter commits a Class A misdemeanor.

(b) A trustee who misapplies trust funds amounting to $500 or more in violation of this chapter, with intent to defraud, commits a felony of the third degree.

(c) A trustee who fails to establish or maintain a construction account in violation of Section 162.006 or fails to establish or maintain an account record for the construction account in violation of Section 162.007 commits a Class A misdemeanor.

*See* Tex. Prop. Code §§ 162.001–007, 162.031–032.

Although the TCTFA does not expressly create a civil remedy, Texas courts have recognized a private cause of action in favor of the statutory beneficiaries against a person who has misapplied trust funds with the requisite scienter. *Dealers Elec. Supply Co. v. Scroggins Const. Co.*, 292 S.W.3d 650, 657 (Tex. 2009); *Young v. Bella Palma, LLC,* No. 14-17-00040-CV, 2022 WL 578442, at *9 (Tex. App. Feb. 25, 2022); *IBEW-NECA Sw. Health &*

*Ben. Fund v. Fairbairn Elec., In*c., No. 3:07-CV-0376-D, 2008 WL 4488970, at *3 (N.D. Tex. Oct. 7, 2008); *Mesa S. CWS Acquisition, LP v. Deep Energy Expl. Partners, LLC,* No. 14-18-00708-CV, 2019 WL 6210213, at *3 (Tex. App. Nov. 21, 2019). This civil liability includes personal liability against a company's principal, officer, or director with the requisite control over funds. *See, e.g., Choy v. Graziano Roofing of Tex., Inc.,* 322 S.W.3d 276, 289–94 (Tex. App. 2009); *C & G, Inc. v. Jones,* 165 S.W.3d 450, 453 (Tex. App. 2005); *Holladay v. CW & A, Inc.,* 60 S.W.3d 243, 245–46 (Tex. App. 2001); *see also Lively v. Carpet Servs., Inc.,* 904 S.W.2d 868, 873–74 (Tex. App. 1995), *writ denied* (Feb. 9, 1996) (TCTFA provides for individual liability based on the fiduciary relationship, not on an implied alter ego status of the trustee).

## IV.

The district court concluded that discharge of the debt that Hann owes Kahkeshani in connection with a breached residential construction contract is precluded by two provisions of the bankruptcy code, specifically 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). We agree that both provisions apply and preclude discharge of Hann's debt to Kahkeshani.

A.     <u>11 U.S.C. § 523 (a)(2)(A)</u>

Section 523(a)(2)(A) of Chapter 11 of the United States Code precludes discharge of a debt for money that was obtained by "false pretenses, a false representation, or actual fraud." The arbitrator concluded that SKH was liable for fraudulent misrepresentation. However, because another SKH representative, Karen Travelstead, a sales agent, signed the draw requests that SKH submitted for Kahkeshani's funds, and there was no evidence that the draw requests were sent to Hann, the arbitrator found there to be "insufficient record evidence to prove that [] Hann (as opposed to other SKH employees) was directly and personally responsible for the misrepresentations in the draw requests." *Id.* Thus, the arbitrator was "unable to conclude that

No. 22-20407

Stephen Hann, individually, made fraudulent misrepresentations to [Kahke-shani]." Nevertheless, the arbitrator concluded that Hann, as SKH's *alter ego*, is personally liable to Kahkeshani for the misrepresentations in the draw requests that Travelstead signed on SKH's behalf.

The arbitrator additionally explained, in paragraph 27 of the award:

> The record evidence is sufficient to establish that Stephen Hann should be held personally liable for the misrepresentations of SKH pursuant to a piercing the corporate veil or *alter ego* theory. The evidence was clear that Stephen Hann diverted trust funds deposited with SKH by [Kahkeshani] (and other homeowners); Mr. Hann used those funds to pay creditors of HBL and to pay his own creditors. Stephen Hann treated SKH's funds as if they were his own; he directed that the funds be used in whatever manner he personally desired. There was no economic benefit to SKH from paying the creditors of HBL, supposedly a separate corporation, or from paying Stephen Hann's own creditors. The evidence showed that, for the case at bar, there was such unity between SKH and Stephen Hann that the separateness of SKH should be ignored; holding only SKH liable for SKH's misrepresentations to [Kahkeshani] would result in an injustice. The undersigned Arbitrator concludes that, as to the acts and events involving [Kahkeshani], SKH was used as a mere tool or business conduit of Stephen Hann.

In rejecting Kahkeshani's assertion that § 523(a)(2)(A) precludes discharge of Hann's debt for the sums awarded by the arbitrator, the bankruptcy court concluded that a debtor who did not personally make a false representation cannot be bound by the fraudulent actions or misrepresentations of another person unless the other person is the debtor's partner or agent. (citing *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1297 (5th Cir. 1995); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992)).

The district court, in contrast, viewed "the crux of the dischargeability issue . . . to be whether Hann made a false misrepresentation—either his own or as the alter ego of SKH." Relying on the arbitrator's findings that "SKH made false representations in the draw requests by claiming it would be used to pay subcontractors rather than Hann's debts from his prior company," and that "Hann was the alter-ego of SKH," the district court determined that "SKH's liability for false representations in the draw requests is appropriately imputed against Hann, individually." Finally, emphasizing that Hann is the sole owner of SKH and had treated the construction funds as his own, the district court concluded: "Hann is liable as an alter-ego of SKH, and the debt is not dischargeable under Section 532(a)(2)(A)."

Our consideration of this issue is greatly assisted by the Supreme Court's recent decision in *Bartenwerfer v. Buckley*, 589 U.S. 69 (2023). There, the Court confirmed that § 523(a)(2)(A) can extend to liability for fraud that a debtor did not personally commit. In reaching this conclusion, the Court reasoned that the provision, which is "written in the passive voice, . . . turns on how the money was obtained, not who committed fraud to obtain it." *Bartenwerfer*, 598 U.S. at 72. The Court likewise rejected the notion that the "fresh start" policy of modern bankruptcy law mandates limiting § 523(a)(2)(A) to the personal actions and statements of the "at fault" debtor (rather than, for example, a faultless partner or associate), recognizing that the bankruptcy code balances multiple interests and policies. *Id.* at 81. The Court also clarified that "§ 523(a)(2)(A) does not define the scope of one person's liability for another's fraud." *Id.* Rather, "[t]hat is the function of the underlying law," which, in *Bartenwerfer*, was the law of California. *Id.* at 81–82. Thus, the Court explained, "section 523(a)(2)(A) takes the debt as it finds it, so if California did not extend the liability to honest partners, § 523(a)(2)(A) would have no role to play." *Id.* at 82.

No. 22-20407

Accordingly, Texas law determines the scope of Hann's liability relative to the misrepresentations in the draw requests that caused the bank to release Kahkeshani's funds to SKH.[4] Though narrowly applied, Texas law does not limit the liability of a beneficial owner or affiliate of a corporation for a contractual obligation of the corporation if that owner or affiliate has "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . beneficial owner . . . or affiliate." *See* TEX. BUS. ORG. CODE § 21.223 (b); *see also Belliveau v. Barco, Inc.* 987 F.3d 122 (5th Cir. 2021) ("actual fraud" involves "dishonesty of purpose or intent to deceive" and is "characterized by deliberately misleading conduct").

Here, as indicated, the parties agreed that the arbitrator would determine Hann's and SKH's liability to Kahkeshani; only the issue of discharge was reserved for the bankruptcy court. After a multi-day hearing, the arbitrator determined that Hann is SKH's *alter ego*, and "should be held personally liable for the misrepresentations of SKH pursuant to a piercing the corporate veil or *alter ego* theory."[5] The district court agreed, concluding: "Hann is liable as an alter-ego of SKH, and the debt is not dischargeable under Section 532(a)(2)(A)."

---

[4] We also note that the cases cited by the bankruptcy court and Hann have simply recognized that partner or agent status—if established—is a legally permissible basis on which one person can bear responsibility for another's statements and/or conduct. In other words, they do not establish an exclusive means. *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1297 (5th Cir. 1995); *Luce v. First Equip. Leasing Corp. (In re Luce)*. Indeed, *RecoverEdge, L.P. v. Pentecost* also recognized the possible use of alter ego status, but concluded that it had not been alleged or found there. 44 F.3d at 1296.

[5] The arbitration award reflects that these issues were among those that the parties had agreed would be decided by the arbitrator.

Considering the arbitrator's determinations regarding SKH's fraudulent misrepresentations and Hann's liability therefor, together with the arbitrator's extensive factual findings regarding Hann's role at SKH and control over when and how the funds received from Kahkeshani were used, the district court's determination that § 523(a)(2)(A) applies to SKH's representations to Kahkeshani, even if not personally made by Hann, is well-founded.  Indeed, in the absence of facts indicating that SKH did not usually obtain funds from its clients via draw requests, or that the representations made in the draw requests submitted to Kahkeshani's bank were atypical, it is unlikely that Hann, as the sole officer, director, and shareholder of SKH, the past owner of "several corporations that built high-valued homes," and a general contractor working on similar projects since 1993, was unaware that SKH's draw requests included the representations regarding payment that are at issue here.

This is especially so since the draw requests were prepared by SKH's office manager, who was responsible for accounting at SKH and HBL, and who worked directly with Hann in handling SKH's payables, i.e., she issued payments, on Hann's instructions to do so, for SKH's unpaid bills, as well as HBL's debts and Hann's own debts, using funds that SKH received from ongoing projects. Furthermore, the draw requests were based on completion percentages provided by the project managers, which Hann approved.

In any event, given the arbitrator's determination of Hann's liability for SKH's misrepresentations, *Bartenwerfer* supports § 523(a)(2)(A)'s application here.  Thus, we conclude that § 523(a)(2)(A) precludes discharge of Hann's debt.

B. <u>11 U.S.C. § 523 (a)(4)</u>

Pursuant to 11 U.S.C. § 523(a)(4), any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny is not

discharged under 11 U.S.C. § 727(a). "Defalcation includes the failure to produce funds entrusted to a fiduciary, even where such conduct does not reach the level of fraud." *In re Pledger*, 592 F. App'x 296, 299 (5th Cir. 2015) (quoting *In re Swor,* 347 F. App'x 113, 116 (5th Cir. 2009)). And, for purposes of 11 U.S.C. § 523(a)(4), the term "defalcation" includes a culpable state of mind requirement that, in the absence of conduct involving "bad faith, moral turpitude, or other immoral conduct, requires an intentional wrong." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74 (2013).

"Intentional" includes "conduct that the fiduciary knows is improper [and] reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* at 274. Thus, "[w]here actual knowledge of wrongdoing is lacking," conduct is considered equivalent "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (quoting Model Penal Code, § 2.02 (2)(c), p. 226 (1985)). "That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.*

We have determined that the TCTFA "creates fiduciary duties encompassed by § 523(a)(4) to the extent that it defines wrongful conduct under the statute." *In re Nicholas,* 956 F.2d 110, 114 (5th Cir. 1992); *Matter of Boyle*, 819 F.2d 583, 592 (5th Cir. 1987); *see also Pledger*, 592 F. App'x at 299 ("[f]or purposes of [§] 523(a)(4), a fiduciary duty only arises if there is a simultaneous wrongful misapplication of funds"). "[U]nder *Nicholas,* a creditor claiming Section 524(a)(4) nondischargeability through the TCTFA must show that (1) the contractor intentionally, knowingly, or with intent to defraud diverted trust funds and (2) the affirmative defenses in the statute do not apply." *Pledger*, 592 F. App'x at 301–02 (citing *Nicholas*, 945 F.2d at 114);

No. 22-20407

*see also Matter of Monaco*, 839 F.3d 413, 418 (5th Cir. 2016) (beneficiary seeking to avail itself of the § 523(a)(4) exception to discharge must show that funds were misapplied under the TCTFA, which includes overcoming the statute's affirmative defenses).

Relevant here, an affirmative defense exists under the TCTFA for "actual expenses directly related to the construction." *See* Tex. Prop. Code § 162.031(b). Disproving this requires showing that the payments in question (a) were not made on the project or overhead, or (b) were made for the debtor's own uses rather than to benefit the health of his failing business. *Pledger*, 592 F. App'x at 302 (citing *Nicholas*, 945 F.2d at 114); *Monaco*, 839 F.3d at 417 n. 1 (affirmative defense does not require that "'funds be spent only on the project for which they were received[;] they may be spent on other projects or expenses related to general business overhead'") (quoting *Swor*, 347 F. Appx. at 116).

The arbitrator concluded that Hann and SKH misapplied trust funds intentionally, knowingly, and with the intent to defraud, for purposes of §§ 162.005(1)(A) and 162.031 of the TCTFA, and awarded damages and attorneys' fees and costs. The arbitrator found that Hann acted with an "intent to defraud" by using trust funds with "the intent to deprive the beneficiaries of the trust funds."

The bankruptcy court thought that the arbitrator's finding regarding Hann's scienter was sufficient to establish the state of mind necessary for a violation of the TCTFA but not the level of mental culpability required by *Bullock* for a debt to be nondischargeable defalcation under 11 U.S.C. § 523(a)(4). The bankruptcy court did not explain the basis for this determination, however, and its rationale is not evident.

Regarding the necessary "defalcation of a fiduciary duty," the district court reasoned that *Bullock*'s scienter requirement was satisfied if Hann

16

"intended to defraud" by using trust funds with "the intent to deprive the beneficiaries of the trust funds" because "intent is a higher culpable state . . . than knowing." Recognizing that the arbitration award "is replete with references to Hann's personal awareness of where and how money was spent," the district court determined the necessary scienter was present.

To show that Hann did not have an affirmative defense, Kahkeshani had to demonstrate that the funds at issue (a) were not used for expenses of the project or overhead; or (b) were made for Hann's personal use rather than to benefit the health of this failing business. The district court concluded that Kahkeshani had sufficiently established, as evidenced by the arbitrator's factual findings, that the money at issue was diverted for Hann's personal use and to pay the previously incurred debt of another company owned by Hann—HBL.

Although acknowledging Hann's belated efforts—submitting a declaration almost two years after the 2013 arbitration hearing and more than a year after the arbitration award was issued—to deny knowledge that the funds received from Kahkeshani were not used for "actual expenses," the district court found the declaration insufficient to "counter the factual findings by the arbitrator" who had "assessed the evidence of the overhead costs and money paid to creditors." Reasoning that it "can rely on the abitrat[or]'s factual findings for support," the district court decided that "Kahkeshani has met his burden." Thus, the district court ruled: "The debt is nondischargeable because Hann knowingly misapplied the trust funds as a fiduciary under Texas law."

On this record, we agree with the district court's determination that Kahkeshani sufficiently established § 523(a)(4)'s application to Hann's debt. As the district court concluded, the arbitrator's factual findings amply demonstrate that Hann had the requisite scienter and that sums paid for

HBL's debts and Hann's personal debts and expenses are not encompassed by the TCTFA's affirmative defense in § 162.031(b).

The record shows that Hann took an active and informed role in SKH's finances. Notably, the arbitration award reflects that Hann confirmed that he was aware of the TCTFA's existence; that he knew payments received from Kahkeshani's bank were supposed to be used to pay subcontractors and suppliers who had furnished labor and materials for Kahkeshani's house, as described in the draw requests; and that he knew payments from Kahkeshani's bank were being made to his own creditors and HBL's creditors.

It likewise is apparent that Hann had direct and exclusive control of the funds of SKH, and that he decided which of SKH's and HBL's creditors were to be paid each week. For this, Hann utilized weekly cash flow forecasts for SKH and for HBL that showed—on separate spreadsheets—debts owed by SKH and debts owed by HBL. Indeed, the arbitrator determined that it was "Hann's plan, intent, or method [] to use funds without regard to the construction project(s) for which the payments had been made."

Explaining the arbitrator's determination that Hann and SKH had misapplied trust funds knowingly, intentionally, or with intent to defraud, paragraphs 11 and 12 of the award state:

> [H]undreds of thousands of dollars were misapplied. [Kahkeshani's] funds were not used to pay the subcontractors, vendors and/or suppliers that SKH represented in its draw requests would be paid.
>
> Stephen Hann used [Kahkeshani's] funds for his own personal use and benefit. While it is laudatory that Stephen Hann made efforts to pay the past bills and expenses of HBL, he was prohibited from doing so with trust funds that were paid to him by customers for whom SKH was building homes or

performing re-modeling work. The credible evidence in this case proved that Stephen Hann knew what expenses (for both SKH and HBL) accrued and were owed; what creditors of HBL and SKH had been paid, in what amounts and when; and what amounts would be paid to whom and when, on a weekly basis.

Regarding evidentiary support for his determination that Hann had acted with "intent to defraud" by "using, disbursing or diverting trust funds with the intent to deprive the beneficiaries of them," the arbitrator emphasized that Hann knew that SKH's subcontractors and suppliers working on [Kahkeshani's] house were *not* being paid with the payments that SKH received from [Kahkeshani's] bank,[6] and that SKH did *not* otherwise have enough money to pay them. Paragraph 22 of the award additionally explains:

> While Stephen Hann may have hoped to repay the beneficiaries with other monies at some time in the future, the evidence was conclusive that Mr. Hann knew that the subcontractors and suppliers on [Kahkeshani's] house were not being paid with [Kahkeshani's] money. Stephen Hann knew SKH did not have sufficient funds to otherwise pay the vendors who had provided labor and materials for [Kahkeshani's] house. Mr. Hann reviewed the expenses on a weekly basis; he was the person who determined who would be paid with the money in SKH's bank accounts; he was the person who used [Kahkeshani's] funds to pay other expenses—liabilities of HBL, liabilities of his own, and

---

[6] This is true even if Hann's belated declaration is considered. Although he denies "personally knowing that the subcontractors and suppliers on [Kahkeshani's] project were not being paid," his explanation for that proposition is neither clear nor sufficient. In contrast, the arbitrator made his determination after receiving documentary evidence and hearing live testimony from Hann's CPA (Carol Burke), the employee who did SKH's and HBL's accounting (Jill Frey), the sales agent who prepared the draw requests for Kahkeshani's project (Karen Travelstead), and SKH project managers.

liabilities of SKH unrelated to [Kahkeshani's] house. No payments were made without Stephen Hann's knowledge and approval. Clearly Mr. Hann had actual awareness of the practice that was being perpetrated. He had to have known that he was using [Kahkeshani's] trust funds to pay expenses unrelated to [Kahkeshani's] house. No other conclusion is reasonably inferable from the evidence.

We are cognizant that the arbitrator's findings were made after a four-day evidentiary hearing during which Hann certainly had the opportunity to explain his actions and intentions. Considering those findings together with the parties' submissions to this court, we can find no fault in the district court's determination that "Hann knowingly misapplied [Kahkeshani's] trust funds as a fiduciary under Texas law"; thus, § 523(a)(4) also precludes discharge of his debt.

V.

For the forgoing reasons, we agree with the district court's determination that, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4), Stephen Hann's debt to Saeed Kahkeshani is nondischargeable. Accordingly, the judgment of the district court is AFFIRMED.